**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **ROY BROOKS, JR.,** | | |
| **Plaintiff,** | | |
| **v.** | | **CIVIL ACTION NO.** |
| | | **2:06CV356-MHT** |
| **COUNTRYWIDE HOME LOANS, INC.** | | |
| **ET AL.,** | | |
| **Defendants.** | | |

**DEFENDANT COUNTRYWIDE HOME LOANS, INC.'S**
**NARRATIVE STATEMENT OF UNDISPUTED FACTS**
**AND MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION FOR SUMMARY JUDGMENT**

Defendant Countrywide Home Loans, Inc. ("Countrywide"), respectfully submits this

Narrative Statement of Undisputed Facts and Memorandum of Law in support of its Motion for

Summary Judgment filed contemporaneously herewith.

**I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

Countrywide is entitled to summary judgment.  While the Complaint's allegations are

confusing and unclear, plaintiff Roy Brooks appears to claim that Countrywide breached a real

estate mortgage contract with Brooks by foreclosing the mortgage in 2004.  Brooks also appears

to allege that Countrywide either failed to apply properly hazard insurance proceeds to the

plaintiff's loan balance after the foreclosure sale or misrepresented to the plaintiff the amount of

proceeds received.  None of these allegations is supported by any evidence.  To the contrary, the

undisputed evidence establishes that Countrywide <u>properly</u> foreclosed the mortgage after <u>Brooks</u>

<u>defaulted</u>.  The evidence also establishes that Countrywide breached no duty to Brooks, and that

Countrywide accurately informed Brooks of the amount of insurance claim proceeds that were

received.  Accordingly, as demonstrated herein, the plaintiff's claims against Countrywide are due to be dismissed.

This case arises from Countrywide's foreclosure of a second mortgage (hereinafter, the "Second Mortgage") granted by plaintiff Roy Brooks to the United States Small Business Association ("SBA") in 1996 pledging three rental or investment properties as security for an SBA loan in the amount of $11,400.  The Second Mortgage was assigned by the SBA to LPP Mortgage Ltd. ("LPP") in 2000, and Countrywide began servicing the Second Mortgage for LPP in late 2003.  Brooks defaulted on the repayment of the Second Mortgage as early as 2001.  Brooks never made any mortgage payments to Countrywide, and Countrywide foreclosed the Second Mortgage on November 10, 2004.  At the time of the foreclosure, Countrywide also was the servicer of a _first_ mortgage (hereinafter, the "First Mortgage") held by LPP, which pledged the same collateral properties for a prior loan.  The First Mortgage was _not_ foreclosed by Countrywide.

The Second Mortgage was properly and rightfully foreclosed by Countywide.  At the time of the foreclosure, Brooks had not made any payment on _either_ mortgage for at least ten months, and both loans were unquestionably in default.  Brooks does not dispute that he was in default or that Countrywide had the contractual right to foreclose.  Nonetheless, Brooks claims in the Complaint (Count One) that Countrywide somehow breached the mortgage contract by foreclosing.  Because the evidence demonstrates that Countrywide rightfully and properly foreclosed the Second Mortgage, the plaintiff's breach of contract claim is due to be dismissed as a matter of law.

The Complaint's other two counts (Counts Two and Three) appear to allege that Countrywide defrauded Brooks and/or acted negligently by informing Brooks _after the_

foreclosure sale that sufficient insurance claim proceeds had been received by Countrywide to pay both of Mr. Brooks' loans in full. (Complaint.) Counts Two and Three strangely allege that Countrywide's alleged post-foreclosure representations regarding insurance proceeds injured Brooks by allowing a fourth property that was not subject to either mortgage to be foreclosed. On their face, these claims simply make no sense. First, the Second Mortgage had already been foreclosed in November 2004, before these representations were allegedly made. Second, the fourth property identified in Counts Two and Three of the Complaint was never foreclosed.

In any event, the evidence establishes that Countrywide did not breach any duty to the plaintiff with respect to the insurance proceeds received after the foreclosure in November 2004. The insurance proceeds received by Countrywide after foreclosure were insufficient (by approximately $40,000) to pay Brooks' outstanding loan balances. Countrywide properly forwarded those proceeds to the mortgage holder for application to Brooks' loans. Moreover, Countrywide accurately disclosed the amount of those claims proceeds to Brooks and his attorney. Thus, Countrywide did not defraud Brooks as to the amount of application of those proceeds. Moreover, Brooks was in no way injured by any of Countrywide's alleged misrepresentations regarding those insurance proceeds, as the foreclosure had already occurred months before any alleged misrepresentations were made, and Brooks never made any effort to satisfy his outstanding mortgage deficiency or to redeem the properties from foreclosure.

In fact, it was the plaintiff who breached the mortgage contracts at issue by failing to have any insurance in place covering the collateral properties when Hurricane Ivan struck in September 2004 (as well as by failing to make any payments on either mortgage). The only insurance claim proceeds that Countrywide received were obtained through lender placed insurance obtained by Countrywide only after Brooks failed to procure insurance of his own as

required by the mortgage contracts.  It is ironic that Brooks is now suing Countrywide for allegedly breaching the second mortgage contract or acting negligently, when Brooks himself undisputedly breached the contract and acted with such repeated and extreme disregard for his own economic interests prior to foreclure.

Because Countrywide did <u>not</u> mislead the plaintiff or breach any duty to him with respect to its receipt of the proceeds of insurance claims on the collateral properties, Counts Two and Three of the Complaint are also due to be dismissed as a matter of law.


## II.    NARRATIVE STATEMENT OF UNDISPUTED FACTS

### A.    The First and Second Mortgages

1.     On or around January 11, 1994, plaintiff Roy Brooks executed a first mortgage (hereinafter, the "First Mortgage") to IAM Credit Union pledging two parcels of property owned by Brooks as collateral for a loan issued to him by the credit union in the amount of $31,500. (Exh. 2[1] ("First Mortgage").)   The two parcels pledged by the mortgage contained <u>three</u> properties located in Troy, Alabama, located at the following addresses: (1) 410 Hubbard Street, (2) 120 Hubbard Street, and (3) 415 Ice Street (hereinafter collectively, the "collateral properties").  (First Mortgage; Exh. 10 (Deposition of Roy Brooks or "Brooks Dep."), pp. 58-62.)[2]  None of these three properties was the plaintiff's principal home or residence.  (Brooks Dep., pp. 65, 149-150, 193-194.)[3]

---

[1]  Except as otherwise stated herein, all evidentiary citations are to the exhibits to Countrywide's Evidentiary Submission in Support of Motion for Summary Judgment, filed contemporaneously herewith.

[2]  The houses on 120 Hubbard Street and 415 Ice Street were located on the same parcel of real property.  (First Mortgage.)

[3]  While some of the properties had renters living in them at some point, plaintiff could not recall if any of the properties had renters living in them at any time material to this lawsuit.  (*Id.* at

2.      On or about February 6, 1996, Brooks executed a <u>second</u> mortgage (hereinafter, the "Second Mortgage") on the same three collateral properties to the United States Small Business Association ("SBA") as security for an $11,400.00 SBA loan. (Exh. 1 ("Second Mortgage").)

**B.      Assignment to LPP and Servicing by Countrywide**

3.      The Second Mortgage was assigned by the SBA to LPP Mortgage Ltd, f/k/a Loan Participant Partners, Ltd. (hereinafter, "LPP") or around August 31, 2000.  (Exh. 1.)  By 2001, Brooks had fallen behind in his payments, and the Second Mortgage loan was in default.  LPP first referred the Second Mortgage to outside foreclosure counsel as early as December 2001. (Exh. 4 (Affidavit of Beth McFadden Rouse ("Rouse Aff.")), ¶ 3, Brooks Dep., exh. 12.) However, LPP was not in a "first lien" position, and the Second Mortgage was not foreclosed at that time.  (Rouse Aff., ¶ 3.)

4.      In July 2003, LPP acquired the First Mortgage from IAM Credit Union, thus obtaining a first lien position.  (Exh. 2; Rouse Aff., ¶ 4.)

5.      In late 2003, Countrywide began servicing the First and Second Mortgages on behalf of LPP.  The Second Mortgage "boarded" Countrywide's servicing system on November 22, 2003, with a principal unpaid balance of $9,287.00.   The First Mortgage boarded Countrywide's system on January 2, 2004, with a principal unpaid balance of $23,324.50.  (Exh. 5 (Declaration of Emily Cedillo-Galindo ("Cedillo-Galindo Dec.")), ¶¶ 2-4.)

---

197.)  The Complaint also references a fourth property, 319 Dean Street, Troy, Alabama, and claims that the Dean Street property was wrongfully foreclosed by Countrywide.  (Complaint, Counts Two and Three.)  As testified by Brooks, however, Brooks never lived at or owned the property at 319 Dean Street, and Countrywide never foreclosed a mortgage on that property.  (Brooks Dep., pp. 49-51, 153.)  Brooks did regularly receive mail at that address, which is owned by his wife, Gloria Starks.  (*Id.* at 51.)

### C. The Foreclosure of the Second Mortgage

6. Countrywide referred the First and Second Mortgages to outside foreclosure counsel in Alabama (the same outside counsel to whom LPP had previously referred the Second Mortgage) in February of 2004. (Cedillo-Galindo Dec., ¶ 6; Rouse Aff., ¶ 5.) On June 21, 2004, Countrywide's attorney, Beth Rouse, mailed Brooks a letter notifying him of the default under the Second Mortgage, of the amount due under the Second Mortgage ($14,894.57), and that Ms. Rouse's firm had been instructed by Countrywide to proceed with foreclosure. (Rouse Aff. ¶ 6, exh. 3; Brooks Dep., pp. 184-185, exh. 13.)

8. On July 16, 2004, Rouse mailed notices to Brooks and to the residents/occupants of the three collateral properties that the <u>Second</u> Mortgage was being foreclosed and that the property would be sold at public auction to satisfy the outstanding mortgage debt. The McFadden firm also advertised the sale in a local newspaper in accordance with the Second Mortgage and applicable law. The foreclosure sale was initially scheduled for August 23, 2004. (Rouse Aff., ¶ 7, exh. 4.)

9. Upon the request of Brooks or his attorney, Countrywide agreed to postpone the foreclosure sale on at least three occasions. First, in August 2004, Brooks requested an opportunity to enter into a "work-out" agreement to attempt to cure the mortgage delinquency over a period of time. (Cedillo-Galindo Dec., ¶ 7.) The August 23rd sale date was postponed while Brooks attempted to negotiate a work-out arrangement with Countrywide. However, Brooks did not qualify for work-out assistance (because he was unable to provide the necessary up-front payment amount). (*Id*; Brooks Dep., pp. 157-160, 166-167, exh. 9.) The foreclosure sale was rescheduled for October 5, 2004. (Rouse Aff., ¶ 8.) (*Id.*)

10.    By letter to the McFadden firm dated October 4, 2004, Brooks' attorney, James N. Thomas, requested that the foreclosure sale be postponed again because some of the properties had been damaged by Hurricane Ivan in September 2004. (Rouse Aff., ¶ 9, exh. 5.) Countrywide agreed to postpone the sale until October 20, 2004, and the sale was then postponed again to November 10, 2004. (*Id.*) Countrywide property inspections revealed minimal hurricane damage and also revealed property values for the collateral properties which were well below the outstanding principal balances of the two defaulted mortgages. (Cedillo-Galindo Dec., ¶ 8.)

11.    Countrywide foreclosed the Second Mortgage on behalf of LPP on November 10, 2004. The collateral properties were sold at public auction in Pike County by auctioneer Brandon Coots. (Rouse Aff., ¶ 10; Exh. 7 (Affidavit of Brandon Coots or "Coots Aff."), ¶ 4.) There were no third-party bidders at the sale, and the three properties were sold to the mortgagee (LPP Mortgage) at the sale for a total combined bid amount of $6,750.00. (Coots Aff., ¶ 4 and exh. 3; Exh. 3 ("Auctioneer's Deed").) The Auctioneer's Deed foreclosing the Second Mortgage was recorded in the Probate Court of Pike County on December 30, 2004. (*Id.*)

12.    Between the time that Countrywide began servicing the First and Second Mortgages and the date of the foreclosure sale on November 10, 2004, Countrywide never received a mortgage payment from Mr. Brooks on either mortgage. (Cedillo-Galindo Dec., ¶ 10.)

13.    At the time of the foreclosure sale, the Second Mortgage had an outstanding balance of $11,376.06, including unpaid principal balance of $ 9.287.00 and accrued interest of $1,897.56. (Cedillo-Galindo Dec., ¶ 9.) Countrywide has never foreclosed the First Mortgage, which continued to be held by Beal Bank after the foreclosure. (Rouse Aff., ¶ 5; Exh. 3.) As of

November 10, 2004, $29,207.33 was owed on the First Mortgage, including an unpaid principal balance of $23,324.50 (Rouse Aff., exh. 9.) After the foreclosure sale bid amount of $6,750 was applied to the Second Mortgage balance, Brooks owed a remaining deficiency on the Second Mortgage of **$4,626.06** (subject to accrual of additional interest). (*Id.* at ¶ 9.)

### D.    Insurance Coverage and Claims

14.    The First and Second Mortgages both required Brooks to maintain hazard insurance insuring the collateral properties to the extent of the mortgagee's interests therein. (First Mortgage, p.1; Second Mortgage ¶ 1.f.)  At no time between November 2003 (when the mortgages were first assigned to Countrywide for servicing) and November 2004 (when the Second Mortgage was foreclosed) did Brooks provide evidence to Countrywide that he had in place <u>any</u> policy of insurance covering <u>any</u> of the collateral properties. (Cedillo-Galinde Dec., ¶ 11.)  Brooks testified at deposition that he does not know when or if the properties were last insured by him. (Brooks Dep., pp. 289-290.)

15.    Countrywide notified Brooks of the absence of insurance coverage on the collateral properties on several occasions. (Cedillo-Galindo Dec., ¶ 11, exh. 6; Brooks Dep., p. 289.)  In or around August 2004, when Mr. Brooks failed to provide proof of insurance in accordance with the requirements of the two mortgages, Countrywide obtained "lender placed" insurance coverage insuring <u>Countrywide's</u> mortgage interest in the properties. *Id.*  The lender placed policies provided coverage only up to the <u>principal balance</u> of the two loans.  As Countrywide notified Brooks in writing at the time, Brooks was <u>not</u> an insured under the lender placed policies, which covered only the <u>lender's</u> interest in the properties. *Id.* Countrywide was <u>not required</u> by the mortgages to obtain insurance insuring the properties, though it had the right and option to do so. (First Mortgage; Second Mortgage; *see also infra*, pp. 17-18.)

16.    On or around September 15, 2004 (several weeks prior to the foreclosure), at least two of the three collateral properties suffered damage from Hurricane Ivan.  (Exh. 7 (Declaration of Ken Cole ("Cole Dec.")), ¶¶ 2-6.)  Mr. Brooks made a claim under the lender placed insurance policies for storm damage to the properties.  Mr. Brooks met with the independent adjuster retained by the insurer, Newport Insurance Company, at the two properties located at 120 Hubbard Street and 415 Ice Street (located on the same parcel) and reported storm damage to those two structures.  (Cole Dec., ¶ 4.)[4]

17.    Or around January 18, 2005, Countrywide received two insurance claim payments from Newport Insurance Company for the collateral properties in the amount of $2,459.85 (120 Hubbard Street) and $735.44 (415 Ice Street), for a combined total of $3,195.29.  These amounts were forwarded by Countrywide to LPP for application to Brooks' loan balance.  The combined insurance proceeds were not sufficient to pay the outstanding debt amount on either of the two mortgages.  (Cedillo-Galindo Dec., ¶ 4, 9; Rouse Aff., exh. 9.)

18.    In early March 2005, almost four months after the foreclosure, Brooks contacted Countrywide regarding the status of his loans and requested a loan payment history for the Second Mortgage.  (Brooks Dep., pp. 236-244; Cedillo-Galindo Dec., ¶ 14.)  Countrywide mailed the plaintiff a loan payment history for the Second Mortgage on March 7, 2005. (Brooks Dep., exh. 23; Cedillo-Galindo Dec., ¶ 14.)[5]    On March 11, 2005, attorney Beth Rouse faxed

---

[4]  Brooks did not show the 410 Hubbard Street property (a separate parcel) to the adjuster, and no claim was adjusted or processed for that property.  (Cole Dec., ¶ 6; Brooks Dep., p. 228.) While Brooks testified in 2006 that the 410 Hubbard Street property had also suffered storm damage in Hurricane Ivan, he had no photographs or evidence of any kind substantiating that claim and submitted none to the insurer. (Brooks Dep., p. 278.)  The property (like the other two collateral properties) was demolished by the City of Troy in 2006.  *See infra*, ¶ 21.

[5]  Also on March 7, 2005, a Countrywide employee sent Mr. Brooks a letter with the loan payment history mistakenly stating that Countrywide had received $9,287 (the amount of the

Brooks a letter providing him with the total amount needed for him to exercise his statutory right to pay both mortgages and to redeem the properties from foreclosure ($43,970.38).[6] (Rouse Aff., ¶ 14, exh. 9; Brooks Dep., pp. 212-213, exh. 21.)

19.     In response, on March 21, 2005, Mr. Brooks' lawyer (James Thomas) wrote Ms. Rouse to request additional information regarding the application of the insurance claim proceeds to the loan balances. (Brooks Dep., pp. 214-215, exh. 22.)  On March 31, 2005, Rouse responded to Mr. Thomas by letter again providing the redemption/payoff figures for the two loans ($43,970.38) and itemizing the two insurance claim payments ($2,459.85 and $735.44) received by Countrywide in January 2005.   (Brooks Dep., pp. 169, 250-254, exh. 10; Rouse Aff., ¶ 15, exh. 10.)

20.     Brooks never made any effort after March 21, 2005, to redeem the properties from foreclosure.  In fact, Brooks testified in his deposition that he did not have the money or intention to pay any more money to redeem his property.  Nor did Mr. Brooks make any effort to contact the insurance company to contest or investigate the amounts of the claims payments. (Brooks Dep., pp. 234, 254-256, 262-263; Rouse Aff., ¶ 16.)

---

principal loan balance of the Second Mortgage at the time of foreclosure) in insurance claim proceeds on December 31, 2004.  (Brooks Dep., exh. 23.)  This was an error, however, as the December 31, 2004, entry on the loan payment history was not, in fact, a receipt of insurance proceeds, but was actually am internal Countrywide bookkeeping transaction to "zero out" the loan after it had been foreclosed and conveyed back to the mortgagee, LPP.  (Cedillo-Galindo Dec., ¶ 14.)  This apparent error was corrected in Beth Rouse's letters to plaintiff and his counsel of March 11 and March 31, 2005, which correctly stated the amounts of insurance payments received and the total amounts owed under both mortgages.  (Rouse Aff., ¶ 15 and exh. 10.)

[6] Under *Ala. Code* § 6-5-253, in order to exercise his one-year statutory right of redemption, Brooks would have been required to pay the purchaser (LPP) the amount paid at the foreclosure sale ($6,750) plus interest, in addition to other "lawful charges."  LPP, as the holder of the note secured by the Second Mortgage as well as the First Mortgage, was entitled to receive full payment of both mortgages (as well as other lawful charges) if Brooks sought to redeem.  *Ala Code* § 6-5-253(a)(4) (1975).

21.    In 2006, after written notice to plaintiff, the City of Troy declared the structures on all three of the collateral properties to be unsafe and demolished the structures. (Brooks Dep., p. 90; Exh. 9.)

22.    After purchasing the three properties at the foreclosure sale in November 2004, LPP attempted to market and sell the collateral properties. LPP sold all three of the properties to Sylvia Davis in June 2006 for a combined sale price of $7,500. From the time that the three properties were first listed for sale with a realtor in May 2005 until Ms. Davis' offer was received, no other party made any offer to purchase any of the three properties. LPP (through its servicing agent, Beal Service Corp.), spent more than $9,000 to maintain, preserve, insure, market and sell the properties (in addition to its foreclosure bid of $6,750), and thus suffered a substantial loss on its sale of the properties. (Exh. 8 (Declaration of Brian Everheart ("Everheart Dec.")), ¶¶ 2-6.

## III.    DISCUSSION OF AUTHORITIES

### A.    Standard Of Review

The standard for summary judgment is well established. As the Supreme Court stated in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

A court facing a summary judgment motion must "determine whether there is a genuine issue for trial," and a dispute of fact must be both material and genuine, such that "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 249-50 (1986). The non-moving party must "go beyond the pleadings and by [her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. *See also Wasson v. The Huntsman Corp.*, 206 F.3d 1150, 1152 (11th Cir. 2000); *Beck v. Prupis*, 162 F.3d 1090 (11th Cir. 1998), *aff'd*, 120 S.Ct. 1608 (June 29, 2000).

### B.    Countrywide Did Not Breach The Mortgage Contract.

Plaintiff has failed to prove any breach of contract by Countrywide. In order to recover for breach of contract, the plaintiff must establish each of the following elements: "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *S. Med. Health Sys., Inc. v. Vaughn*, 669 So.2d 98, 99 (Ala. 1995); *see also McGinney v. Jackson*, 575 So.2d 1070, 1071-72 (Ala. 1991). Because plaintiff has not offered evidence of any breach or nonperformance by Countrywide, and because he himself failed to perform under the mortgage contract, his contract claim is due to be dismissed.

### 1.    Countrywide Properly Foreclosed the Second Mortgage.

Countrywide did not breach its contract with Brooks by foreclosing the Second Mortgage. To the contrary, Brooks breached the mortgage contracts at issue by: (1) failing to pay the secured indebtedness; and (2) failing to maintain hazard insurance on the collateral

properties as required.  (*See infra*, Statement of Facts, ¶¶ 3-7, 13-14.)  Brooks <u>admitted</u> in his

deposition that he had defaulted in the repayment of his loans and that he failed to maintain

insurance as required.  (Brooks Dep., pp. 289, 297.)  Either breach entitled Countrywide to

accelerate all amounts due under either or both mortgages, to foreclose, and to sell the collateral

properties at public sale.  (First Mortgage; Second Mortgage, ¶ 3.)  Countrywide elected to

foreclosure the Second Mortgage pursuant to and in accordance with its contractual rights under

the Second Mortgage.   Having not performed his own obligations under the mortgage contract,

Brooks cannot recover from Countrywide for its foreclosure.  *S. Med. Health Sys., Inc.* 669 So.2d

at 99 (Ala. 1995); *Redman v. Federal Home Loan Mortgage Corp.*, 765 So. 2d 630 (Ala. 2000)

(affirming summary judgment for mortgagee where borrower defaulted and foreclosure sale was

noticed in accordance with mortgage).

Nor was there anything improper about the manner in which Countrywide foreclosed.  It

is undisputed that Countrywide (through outside counsel) properly notified Brooks of his default

and that Countrywide properly advertised and conducted the foreclosure sale.  (Rouse Aff., ¶¶ 6-

10; Coots Aff., ¶¶ 4-5; Brooks Dep., pp. 155-156, 171-173; Second Mortgage, ¶ 3 (four weeks

publication required, as provided by Countrywide's foreclosure counsel).)   While Brooks

correctly alleges that Countrywide agreed to <u>postpone</u> the foreclosure sale, which Countrywide

did at Brooks' request on at least <u>three</u> occasions, Brooks ultimately failed to cure his long-

standing default.  In fact, Brooks <u>never</u> made a mortgage payment to Countrywide.  (Cedillo-

Galindo Dec., ¶ 10.)  Countrywide therefore rescheduled the foreclosure sale and proceeded with the foreclosure of the Second Mortgage in November 2004, as it was contractually entitled to do. Brooks has not offered any evidence that Countrywide ever agreed to postpone the foreclosure sale beyond November 10, 2004.  (*See* Rouse Aff., ¶ 12.)  Nor has Brooks provided evidence that he attempted to, or even could have, cured the delinquency prior to the foreclosure sale or purchased the property at the foreclosure sale.  (Brooks Dep., pp. 254-256.)[7]

In sum, the evidence establishes unequivocally that Countywide was entitled to foreclose the Second Mortgage and that it did so in accordance with the terms of the Second Mortgage contract.  Brooks, on the other hand, breached the contract, and his breach is what lead to the foreclosure.  Brooks cannot recover from Countrywide for breach of contract.

2.    Countrywide Did Not Breach The Mortgage Contract With Respect To The Insurance Proceeds Received After Foreclosure.

While not referenced in Count One of the Complaint, Brooks suggested in his deposition that he was somehow entitled to have both of his mortgages fully satisfied from the proceeds of insurance claims made under lender-placed insurance policies that Countrywide had obtained to protect its interest in the properties shortly before Hurricane Ivan struck Alabama in 2004.  This

---

[7] Brooks testified that he attempted to attend the foreclosure sale on November 10th after his attorney informed him that day that the sale had not been postponed, and that he does not believe that the sale actually occurred on November 10, 2004.  However, the auctioneer has submitted sworn affidavit testimony and contemporaneous business records, as well as the recorded Auctioneer's Deed, establishing that the sale was conducted as advertised on November 10th.  (Coots Aff., ¶ 4.)  In fact, the sale had already occurred by the time Brooks' attorney contacted Rouse on November 10th to confirm that the sale was taking place on November 10th.  (Rouse Aff. ¶¶ 11-12.)  In any event, since Brooks could not have purchased the property at the foreclosure sale over the winning bid of $6,750 (by the mortgagee, LPP), Brooks' failure or inability to locate the auctioneer is immaterial.  (Brooks Dep., pp. 254-256.)

simply is not, and could never be, the case, and these allegations cannot support a viable claim for breach of the mortgage contract.

First, the only insurance claim proceeds that Countrywide received (about $3200) were far from sufficient to satisfy even the Second Mortgage deficiency ($4,626.06), let alone both mortgages (which had a combined outstanding balance of over $43,000). (Cedillo-Galindo Dec., ¶ 9; Rouse Aff., exh. 9.) The insurance claim payments for damage to the already-dilapidated (and since condemned) collateral properties were thus far from sufficient to pay either of Brooks' two mortgages.

In fact, the lender placed coverage that Countrywide obtained could never have paid Brooks' loans in full. Rather, the lender placed policies provided coverage only up to the unpaid principal balance of Mr. Brooks' two mortgage loans. Because Mr. Brooks' loans had both been in default for long periods, each loan had an outstanding balance (including accrued interest, foreclosure and other fees, and other charges) well in excess of the unpaid principal balance. (Cedillo-Galindo Dec., exh. 5; Rouse Aff., exh. 9.) Thus, even if the insurer determined that the properties suffered sufficient storm damage for the insurer to pay its full policy limits under the lender placed policies, the maximum insurance coverage available would still have been insufficient to pay Brooks' two mortgages in full.

Second, the only insurance proceeds that were received by Countrywide were a windfall to Mr. Brooks and operated to decrease his outstanding loan balance in spite of Brooks' own failure to obtain insurance on the collateral properties as required by the two mortgages. It was the plaintiff who breached the mortgage contracts in the first place by failing to obtain insurance as required, thus forcing Countrywide to protect its own interest in the property by obtaining lender placed insurance at its own cost. To the extent that Brooks' loan balances were reduced at

all by insurance proceeds received by Countrywide, Brooks thus received a windfall.  Brooks cannot now complain that the windfall procured for him by Countrywide should have been larger.  *See Pennsylvania Co. for Insurances on Lives and Granting Annuities v. Conway*, 46 A.2d 166, 168 (Pa. 1946) ("The application of the insurance money to the mortgage debt was as much as the defendant [mortgagor] could as for in the circumstances."); *United Stores of America, Inc. v. Fireman's Fund Ins. Co.*, 420 F.2d 337, 340 (8th Cir. 1970) (lessee was entitled to have lessor apply insurance proceeds received to reduce loan balance).[8]

As stated in the Statement of Facts above, at least two of the three collateral properties did appear to suffer at least some damage form Hurricane Ivan in September 2004.  While that damage was minimal, Brooks, in breach of the mortgage contracts, did <u>not</u> have <u>any</u> hazard or homeowners insurance covering <u>any</u> of the three properties.  (Brooks Dep., p. 289; Cedillo-Galindo Dec., ¶ 11.)  Had it not been for Countrywide, there would have been <u>no insurance</u> covering the properties <u>at all</u>.  However, in August 2004, after sending several letters to Brooks requesting that he obtain insurance on the collateral properties and provide evidence thereof to Countrywide, Countrywide obtained lender placed insurance coverage insuring <u>Countrywide's</u> mortgage interest in the properties.  As Countrywide's repeated letters to Brooks explained, Brooks was <u>not</u> an insured under the lender placed coverage, and the lender placed policies

---

[8]  *See also Pace v. Colonial Penn Ins. Co.*, 690 So. 2d 369, 371 (Ala. Civ. App. 1996); *American Fire and Indemnity Co. v. Weeks*, 693 So. 2d 1386, 1388 (Ala. Civ. App. 1997) ("[I]f there is a foreclosure upon mortgage property after the property has sustained a loss or damage, the mortgagee may elect one of two remedies.  The mortgagee may collect the insurance proceeds arising from the damage to the property, in satisfaction of the full mortgage debt, up to the limits of the policy.  Alternatively, the mortgagee may seek repayment through a foreclosure sale.  If the sale does not fully satisfy the debt, the mortgagee may recover the balance from the insurance proceeds.  If, however, the sale does satisfy the debt, the mortgagee has no further claim upon the insurance proceeds. "  *Weeks*, 693 So. 2d at 1388, *citing Aetna Ins. Co. v. Baldwin County Bldg. & Loan Ass'n.*, 163 So. 604 (Ala. 1935).

would not provide any coverage beyond the <u>unpaid principal balances</u> of his loans.  In its letter of August 8, 2004, for instance, Countrywide advised Brooks:

> "This is a reminder that we have not received verification of acceptable hazard insurance on the above-referenced property [415 Ice Street], and therefore we will continue the process of obtaining the required insurance at your expense.  If you have already forwarded your policy to us, please review your next monthly coupon statement to confirm that our records have been updated to reflect our receipt of this information.
>
> We are in the process of obtaining fire insurance coverage on your property.  ***This insurance will protect Countrywide's interest in your property.  This insurance will only cover the value of your property up to the current principal balance of your loan less deductible, even if the cost to fully repair your property exceeds your loan balance.***  Accordingly, this insurance may not be sufficient to fully restore or repair your property to its previous condition, and this insurance will not protect any equity that you may have built up on your property. . . . Please note that this insurance will likely provide less coverage than was previously in effect, it may duplicate existing coverage, and it may be more expensive that your previous coverage.  ***In the event of a claim, all payments under this coverage will be made to Countrywide and not to you.***

(Cedillo-Galindo Dec., exh. 6.)

The Second Mortgage provided the following with respect to the borrower's <u>obligations</u> and the lender's <u>options</u> with respect to maintaining insurance on the collateral properties:

> 1.    The mortgagor covenants and agrees as follows:
>
> *f.*    He will continuously maintain hazard insurance, of such type or types and in such amounts as the mortgagee may from time to time require on the improvements now or hereafter on said property, and will pay promptly when due any premiums therefor. All insurance shall be carried in companies acceptable to mortgagee and the policies and renewals thereof shall be held by mortgagee and have attached thereto loss payable clauses in favor or and in form acceptable to the mortgagee.  In the event of loss, mortgagor will give immediate notice in writing to mortgagee, *and mortgagee **may** make proof of loss if not made promptly by mortgagor*, and each insurance company concerned is hereby authorized and directed to make payment for such loss directly to

mortgagee instead of to mortgagor and mortgagee jointly, and the insurance proceeds, or any part thereof, may be applied by mortgagee at its option either to the reduction of the indebtedness hereby secured or to the restoration or repair of the property damaged or destroyed.  In the event of foreclosure of this mortgage, or other transfer of title to said property in extinguishment of the indebtedness secured hereby, all right, title and interest of the mortgagor in and to any insurance policies then in force shall pass to the purchaser or mortgage *or, at the option of the mortgagee, may be surrendered for a refund*.

*          *          *

6.      In the event the mortgagor fails to pay any Federal, state or local tax assessment, income tax or other lien, charge fee **or other expense charged against the property**, the mortgagee is hereby authorized **at his option** to pay the same.  Any sums so paid by the mortgagee shall be added to and become a part of the principal amount of the indebtedness evidence by said note, subject to the same terms and conditions. . . .

(Second Mortgage, ¶ 1.(f), 6 (emphasis added).)

Thus, Brooks never obtained the insurance that he was required to maintain, and Countrywide elected (though it was <u>not</u> required) to obtain insurance to protect its own interests in the property.  While Countrywide had the contractual right to charge Brooks for the cost of that insurance, Brooks <u>never made any payments</u> for the premiums for the lender placed insurance covering his properties (in fact, he made no payments to Countrywide at all).  Though he had done nothing to procure insurance of his own, within days after Hurricane Ivan in September 2004, Brooks reported losses to at least two of the three collateral properties to the insurance company (Newport Insurance Company) that issued the lender placed coverage to Countrywide.  Brooks then met with the insurer's independent adjuster to show him the storm damage, and the insurer processed and paid claims on the two properties that Brooks showed to the adjuster.  (Cole Dec., ¶ 4; Cedillo-Galindo Dec., ¶¶ 12-13.)

After the foreclosure, Countrywide received the proceeds of the insurance claims. The claim proceeds ($3,195.29) were insufficient, by more than $40,000, to pay the outstanding balance of the two mortgages (more than $43,000 at the time of foreclosure). (Statement of Facts, ¶ 17-19.)  Countrywide forwarded the funds to LPP, the mortgage holder (who still held the First Mortgage) and who had purchased the properties at the foreclosure sale.  (Cedillo-Galindo Dec., ¶ 13.)

Several months _after_ the foreclosure, Brooks and his attorney asked Countrywide how much money had been applied to Brooks' loan as a result of the insurance claims and how much was required of Brooks to redeem the properties from foreclosure.  In response to those inquiries, Countrywide's outside foreclosure counsel sent letters to plaintiff's counsel itemizing the two insurance payments that had been received by Countrywide.  (Statement of Facts, ¶ 18-19.) Countrywide thus _correctly_ informed Brooks in writing of the amounts of insurance proceeds that had been received by Countrywide after foreclosure.  Counsel's letters also clearly advised Brooks and his attorneys of the amount that Brooks would have had to pay to redeem the properties from foreclosure.  (Rouse Aff., ¶¶ 14-15, exh. 9, 10.)

Brooks, however, never made _any_ effort to redeem the properties from foreclosure.  In fact, he testified that he had no intention of redeeming them unless the proceeds of the insurance were sufficient to pay both of his loans _in full_ (more than $40,000). (Brooks Dep., p. 256.)  Nor did Brooks make any effort to contact the insurance company to question the amount of the claim payments made to Countrywide.  Rather, Mr. Brooks simply ignored the situation until two years later, when he filed this lawsuit in March 2006.  (Brooks Dep., pp. 254, 262-263.)

In sum, the evidence establishes that Countrywide properly handled the only proceeds that it received from the insurance claims on the properties and that those proceeds were far from

sufficient to pay off <u>either</u> of the plaintiff's two mortgage balances. While plaintiff thus received a windfall as a result of Countrywide's voluntary procurement of insurance coverage on the collateral properties, that windfall was not sufficient to pay off Brooks' entire debt. Brooks has no basis to complain about Countrywide's procurement of those insurance proceeds. Because there is no evidence that Countrywide breached the mortgage contract, the plaintiff's contract claims is due to be dismissed as a matter of law.

### C.    The Plaintiff's Fraud and Negligence Claims Also Fail As A Matter Of Law.

In Counts Two and Three of the Complaint, the plaintiff claims that Countrywide negligently or fraudulently informed Brooks in December 2004 and/or March 2005 that "all funds had been fully satisfied for property located at <u>319 Dean Street</u>, Troy, Alabama." (Complaint, ¶¶ 13-14, 19.) Plaintiff claims that he was injured by this allegedly fraudulent or negligent representation in that his property at <u>319 Dean Street</u> was advertised for foreclosure and sold at foreclosure sale. (Complaint, ¶¶ 17, 21.) As demonstrated herein, these allegations fail to state any viable claim against Countrywide and are due to be dismissed as a matter of law.

In order to prove a claim for misrepresentation under Alabama law, a plaintiff must establish each of the following elements by substantial evidence: "(1) a misrepresentation of a material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) that was <u>reasonably relied on by the plaintiff</u> under the circumstances, and (4) that <u>caused damage as a proximate consequence.</u>" *BSI Rentals v. Wendt*, 893 So.2d 1184 (Ala. 2004) (emphasis added). Similarly, to prove negligence, Brooks must provide substantial evidence of (1) a duty, (2) breach of that duty, (3) proximate causation, and (4) damage. *Armstrong Bus. Serv., Inc. v. AmSouth Bank*, 817 So.2d 665 (Ala. 2001). Plaintiff has failed to establish any fraud or negligence by Countrywide in this case, or any damage suffered by Plaintiff as a result.

First, contrary to the allegations of Counts Two and Three of the Complaint, Countrywide never foreclosed on the property located at 319 Dean Street. (Brooks Dep., p. 153.) The plaintiff never owned that property, and the property was never subject to either of the mortgages serviced by Countrywide. (Brooks Dep., pp. 49-51.) Accordingly, Brooks was never injured by the foreclosure or sale of 319 Dean Street (neither of which ever happened), and Countrywide breached no duty with respect to that property.

Second, even assuming that Counts Two and Three are intended to refer to the three collateral properties subject to the Second Mortgage, Countrywide accurately disclosed the amounts of the only insurance claim payments it received. Plaintiff testified at deposition that he inquired about his mortgage loan balances in March 2005, several months after the foreclosure. When he was confused by Countrywide's initial response, Brooks requested a loan payment history and detailed statement of the amounts due on the mortgages. (Brooks Dep., pp. 236-244; Cedillo-Galindo Dec., ¶ 14.) His attorney then followed up with a written request seeking the same information and an itemization of any insurance proceeds applied to plaintiff's loan. On March 31, 2005, while Brooks still had eight months to redeem the properties if he desired to do so,[9] Countrywide's foreclosure counsel sent plaintiff a detailed written itemization of the amounts still owed on the plaintiff's two mortgages following the November 2004 foreclosure. (Rouse Aff., ¶ 15; Brooks Dep., pp. 250-254, exh. 10.) The plaintiff made no effort to redeem. Nor did he contact the insurer or adjuster to question the amounts paid on the insurance claims.

Third, Countrywide's allegedly negligent or fraudulent misrepresentations (that sufficient funds had been received to "satisfy" the "property") were made long after the foreclosure had already occurred. (Rouse Aff., ¶ 10; Coots Aff., ¶ 4; Auctioneer's Deed.) Brooks could not,

---

[9] *See Ala. Code* § 6-5-248 (1975) (1 year statutory right of redemption).

therefore, have relied to his detriment on the alleged representations regarding insurance proceeds, and he was not damaged or injured by them. To the contrary, the mortgaged properties (none of which were located at 319 Dean Street) had already been sold. Even after Countrywide informed Brooks of the correct amount of insurance claim proceeds it received, Brooks made <u>no effort</u> to redeem the properties from foreclosure. (Brooks Dep., pp. 254, 262-263.) *See Reynolds v. Birnbaum*, 534 So. 2d 1052 (Ala. 1988) (mortgagees' and foreclosing attorney's allegedly fraudulent statements regarding foreclosure were not relied upon by or injurious to plaintiff); *Pace v. Colonial Penn Ins. Co.*, 690 So. 2d 369, 372 (Ala. Civ. App. 1996) (mortgagees represented by counsel held to have knowledge of attorney (particularly as to impact of "foreclosure after loss" rule) and could not justifiably relied upon on alleged misrepresentations of insurer as to payment of insurance proceeds after foreclosure).

In sum, Countrywide properly foreclosed the Second Mortgage and properly handled the only insurance proceeds that it received. Brooks was unable to redeem the properties or cure his default. There is simply no evidence that Countrywide breached any duty to the plaintiff or that Brooks suffered any injury as a result. For these reasons, plaintiff's negligence and fraud claims are also due to be dismissed as a matter of law.

## IV.    CONCLUSION

For the foregoing reasons, Countrywide is entitled to summary judgment in its favor as to all claims asserted in the Complaint in this action.

Respectfully submitted,


/s/ Alan M. Warfield
Alan M. Warfield (ASB #9183-R68A)
Attorney for Defendant
Countrywide Home Loans


OF COUNSEL:

WALSTON WELLS & BIRCHALL, LLP
1819 5th Avenue North
P. O. Box 830642
Birmingham, Alabama 35203/35283-0642
Telephone:  (205) 244-5200
Facsimile:   (205) 244-5400


## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

J.E. Sawyer, Jr., Esq.
203 S. Edwards Street
Enterprise, AL 36330

Dated the 15th day of March, 2007.


/s/ Alan M. Warfield
OF COUNSEL