In The Matter Of:

ROY BROOKS, JR.
v.
COUNTRYWIDE HOME LOANS, INC., ET AL.

NO. 2:06CV356-VPM

---

ROY BROOKS, JR.
September 15, 2006

---



TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

THE HIGHEST QUALITY IN COURT REPORTING

EXHIBIT 10
(Evidentiary Submission)

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 1 to 4)

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO. 2:06CV356-VPM

ROY BROOKS, JR.,
    Plaintiff,
vs.
COUNTRYWIDE HOME LOANS, INC., et al.,
    Defendants.

DEPOSITION
OF
ROY BROOKS, JR.
September 15, 2006

REPORTED BY:  Sabrina Lewis
       Certified Shorthand Reporter
       Registered Diplomate Reporter
       Notary Public

---

Page 3

1  A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4     Mr. Alan M. Warfield
5     Attorney at Law
6     Walston, Wells & Birchall, LLP
7     One Federal Place, Suite 1100
8     1819 Fifth Avenue North
9     Birmingham, Alabama 35203
10
11 FOR THE DEFENDANT:
12    Mr. J.E. Sawyer, Jr.
13    Attorney at Law
14    203 South Edwards Street
15    Enterprise, Alabama 36330
16
17
18
19
20
21
22
23

---

Page 2

1      S T I P U L A T I O N S
2
3       IT IS STIPULATED AND AGREED,
4  by and between the parties, through their
5  respective counsel, that the deposition of
6  ROY BROOKS, JR. may be taken before Sabrina
7  Lewis, Commissioner, Certified Shorthand
8  Reporter, Registered Diplomate Reporter,
9  and Notary Public;
10      That the signature to and
11 reading of the deposition by the witness is
12 waived, the deposition to have the same
13 force and effect as if full compliance had
14 been had with all laws and rules of Court
15 relating to the taking of depositions;
16      That it shall not be necessary
17 for any objections to be made by counsel to
18 any questions, except as to form or leading
19 questions, and that counsel for the parties
20 may make objections and assign grounds at
21 the time of trial, or at the time said
22 deposition is offered in evidence, or prior
23 thereto.

---

Page 4

1      INDEX OF EXAMINATION
2            PAGE:
3  EXAMINATION BY MR. WARFIELD     6
4
5
6
7       INDEX OF EXHIBITS
8            PAGE:
9  Defendant's Exhibit 1     24
10 Defendant's Exhibit 2     50
11 Defendant's Exhibit 3     75
12 Defendant's Exhibit 4     77
13 Defendant's Exhibit 5     98
14 Defendant's Exhibit 6     124
15 Defendant's Exhibit 7     127
16 Defendant's Exhibits 8 and 9     130
17 Defendant's Exhibit 9A     188
18 Defendant's Exhibit 10     169
19 Defendant's Exhibit 11     171
20 Defendant's Exhibit 12     182
21 Defendant's Exhibit 13     184
22 Defendant's Exhibit 14     186
23 Defendant's Exhibits 15 and 16     190

---

ROY BROOKS, JR.                                                    ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.                               September 15, 2006

(Pages 5 to 8)

Page 5

1           INDEX OF EXHIBITS (continuing)
2                     PAGE:
3    Defendant's Exhibit 17          197
4    Defendant's Exhibits 18, 19, 20    205
5    Defendant's Exhibit 21          212
6    Defendant's Exhibit 22          214
7    Defendant's Exhibit 23          236
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 6

1            I, Sabrina Lewis, a Certified
2    Shorthand Reporter and Registered Diplomate
3    Reporter of Birmingham, Alabama, and a
4    Notary Public for the State of Alabama at
5    Large, acting as Commissioner, certify that
6    on this date, pursuant to Rule 30 of the
7    Alabama Rules of Civil Procedure and the
8    foregoing stipulation of counsel, there
9    came before me at One Federal Place, Suite
10   1100, 1819 Fifth Avenue North, Birmingham,
11   Alabama, on September 15, 2006, commencing
12   at 2:28 p.m., ROY BROOKS, JR., witness in
13   the above cause, for oral examination,
14   whereupon the following proceedings were
15   had:
16            THE COURT REPORTER:  Usual
17   stipulations?
18         (Affirmed by counsel.)
19            ROY BROOKS, JR.,
20   being first duly sworn, was examined and
21   testified as follows:
22   EXAMINATION BY MR. WARFIELD:
23       Q.   Good afternoon, Mr. Brooks.  My

Page 7

1    name is Alan Warfield.  I'm an attorney for
2    Countrywide Home Loans.  And I'll be asking
3    you questions today about the lawsuit that
4    you have filed against Countrywide, okay?
5    And I don't know if you've given a
6    deposition before, but I'm going to give
7    you a few rules and suggestions for the
8    afternoon.
9            I'll be asking you a series of
10   questions.  And the first rule is whenever
11   you answer my question, please do so
12   verbally.  She can't take down a head nod
13   or a head shake.  So a yes or no answer or
14   a verbal answer is what we'll need to get
15   it on the record, okay?
16       A.   Okay.
17       Q.   All right.  If at any time
18   today you don't understand one of my
19   questions, please just let me know, okay?
20       A.   I will.
21       Q.   Okay.  I'd rather you let me
22   know and let me rephrase it than have you
23   try to guess or figure out what I'm getting

Page 8

1    at, okay?
2        A.   I will.
3        Q.   If at any point today you need
4    to take a break, go to the bathroom, get
5    something to drink, just let me know.  I'm
6    happy to stop, okay?
7        A.   I will.
8        Q.   Would you state your full name
9    for the record for me, please.
10       A.   Roy Brooks.
11       Q.   Do you have a middle name?
12       A.   Junior.
13       Q.   I'm sorry?
14       A.   The end name.  Junior.
15       Q.   No middle name?  Okay.  What is
16   your date of birth, Mr. Brooks?
17       A.   4th the 13th of '47.
18       Q.   April 13th, '47?
19       A.   Right.
20       Q.   And your Social Security
21   number?
22       A.   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.
23       Q.   0545?

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 21 to 24)

Page 21

1  they teach you to -- when somebody die how
2  to talk to the peoples and keep them calm
3  and how to work with funerals and direct
4  and do all that stuff.
5      Q.   And you said that was through
6  Alabama State?
7      A.   Yeah.
8      Q.   Did you receive any sort of
9  degree or certificates?
10     A.   Yes, I received a certificate.
11     Q.   Certificate? Did you receive
12  any degree or certificate from Wayne
13  University in music?
14     A.   Yes.
15     Q.   What kind?
16     A.   I received one in piano. I
17  received one in organ.
18     Q.   These are certificates?
19     A.   Yeah.
20     Q.   Do you have any other --
21     A.   Yeah. I went to -- I got -- I
22  had a study course through Lynchburg,
23  Virginia school. And I took a course there

Page 22

1  through Jerry Falwell and them.
2      Q.   What kind of course?
3      A.   A biblical course. Then I went
4  to George Wallace, and I took electronic
5  fundamentals. I went there about two
6  years.
7      Q.   Did you obtain a degree of any
8  kind in electronics?
9      A.   No. I got a certificate in
10  electronics.
11     Q.   Any other education or school
12  work?
13     A.   Yes. Oh, there's so many. Can
14  I go back and look at my papers?
15     Q.   Sure, sure.
16     A.   It was so many of them.
17     Q.   And I'd say at any point,
18  Mr. Brooks, today if there's a question I
19  ask you that if there's some document or
20  papers that you can look at to help you
21  remind yourself, I welcome you to do so.
22     A.   Yeah, okay.
23          Oh, yeah. I went to

Page 23

1  underwriter's school. I wrote insurance
2  for Booker T. Washington Insurance Company.
3      Q.   So you went through a program
4  put on by Booker T. Washington?
5      A.   Yeah, and I wrote -- I was one
6  of the underwriters.
7      Q.   Sort of training provided by
8  them for its employees?
9      A.   Right.
10     Q.   Were you employed as an
11  underwriter?
12     A.   Right.
13     Q.   How long did you do that?
14     A.   About two years.
15     Q.   Anything else?
16     A.   Yeah. I went to first aid
17  school, emergency first aid.
18     Q.   Where was that?
19     A.   We done that through Dorsey
20  Trailer, had a special program.
21     Q.   If you don't mind my asking,
22  what are you looking at there?
23     A.   This is some publication for me

Page 24

1  that was ran in the papers I think when I
2  ran for House of Representatives.
3      Q.   Okay. Do you mind if I have a
4  copy of this?
5      A.   No, I don't. Don't mind.
6      Q.   Is that a copy I can have?
7      A.   Yes, yes.
8          (Whereupon, Defendant's
9          Exhibit 1 was marked for
10         identification.)
11     Q.   (BY MR. WARFIELD:) Can you
12  think of any other post-high school
13  education or degrees you've gotten?
14     A.   Well, I took typing from Warren
15  Smith High School. They had a program, and
16  I got a certificate in that.
17     Q.   Okay.
18     A.   I also as president of the
19  union at Dorsey Trailer, I received
20  several -- went to several schools.
21  Arbitration school. We went here at the
22  college here in Birmingham. And how to
23  write grievances, all that. I went to

ROY BROOKS, JR.                                                    ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.                               September 15, 2006

(Pages 49 to 52)

Page 49

1    planning on drawing it, but she don't have
2    one.  You know, what's current.
3        Q.    But she's told you what she
4    intends to do?
5        A.    Yes, what she want done.
6        Q.    But currently, do you have her
7    power of attorney over all of her financial
8    matters?
9        A.    Right.
10       Q.    Now, what about the Dean Street
11   property in Troy, 319 Dean Street?  Do you
12   know who owns that?
13       A.    Yes.  I think I got a list.  I
14   had it right there.  The land at 319 Dean
15   Street belongs to Ms. Gloria Starks.  It
16   always belonged to her, and it ain't never
17   had my name on it.  Her and father's home.
18       Q.    This document you just handed
19   to me, is this something you got from
20   the --
21       A.    The court.  I went to the
22   courthouse and got it yesterday.
23       Q.    Do you mind if I mark it as an

Page 50

1    exhibit?
2        A.    Yeah.  I went you to mark it an
3    exhibit.
4        Q.    Okay.
5        A.    And show it to him, too.
6             MR. SAWYER:  I'll get a copy of
7    the deposition.  And you will, too.
8             (Whereupon, Defendant's
9             Exhibit 2 was marked for
10            identification.)
11       Q.    (BY MR. WARFIELD:)  So the
12   property at 319 Dean Street is owned by
13   your wife, Gloria Starks?
14       A.    She wasn't my wife, though,
15   when this happened.
16       Q.    Okay.  I understand.  But
17   currently, though --
18       A.    Yeah, it's owned by her.
19       Q.    Have you at any time owned any
20   interest in that property?
21       A.    Never owned any interest in it.
22       Q.    Have you at any time lived at
23   that property?

Page 51

1        A.    Except to go by there to see
2    her; you know, do a little courting.
3        Q.    But you told me the phone
4    number that you give to people --
5        A.    Yeah, is at that property
6    because I don't have one.
7        Q.    Do you use that property as a
8    mailing address?
9        A.    Sometimes.
10       Q.    Okay.  So I guess we haven't
11   talked about any properties yet that are in
12   your name?
13       A.    Right.
14       Q.    Are there any other pieces of
15   real property that are currently owned by
16   you or in your name?
17       A.    Well, really not because I
18   signed the property over -- my ex-wife, I
19   signed it over to her.  So I really
20   shouldn't have any in my name.
21       Q.    Where is that property located?
22       A.    311 Griffin Street.
23       Q.    In Troy?

Page 52

1        A.    Right.
2        Q.    And it's your understanding
3    that you have deeded your interest to --
4        A.    Yeah.  I went to a lawyer's
5    office and signed over to her.
6        Q.    So your ex-wife now owns that
7    property?
8        A.    Yeah.  Right.
9        Q.    And again, just try and let
10   me --
11       A.    Yes, I'm sorry.
12       Q.    So today there is no real
13   property owned by you in your name?
14       A.    No.
15       Q.    Tell me when the last time --
16   strike that.  Bad way to start the
17   question.
18            At some point have you owned
19   real property in your name?
20       A.    Yes.  I owned the Pi Kappa
21   House in Troy, Alabama at 500 North Three
22   Notch Street.
23       Q.    North Three Notch Street?

ROY BROOKS, JR.                                                    ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.                               September 15, 2006

(Pages 57 to 60)

Page 57

1    A.   Yeah.
2    Q.   Any others?
3    A.   Like I told you, I owned the
4  one with my wife, the one on 311 Griffin
5  Street.
6    Q.   Yes, sir.  I have that one,
7  too.
8    A.   That's all I own.
9    Q.   It's my understanding,
10 Mr. Brooks, that it's primarily the two
11 Hubbard Street properties and the Ice
12 Street property that are at issue in this
13 lawsuit; is that correct?
14   A.   Right.
15   Q.   Let's talk about those three
16 properties.  Let's start with 120 Hubbard
17 Street.
18   A.   Okay.
19   Q.   When did you obtain any
20 ownership interest in that property?
21   A.   Just a second.  I think it was
22 1985.  Hold on just a minute.
23        It was October 1987.

Page 58

1    Q.   And who did you buy it from?
2    A.   I bought it from Michael and
3  Pearl Inez Woodard.
4    Q.   Woodard?
5    A.   Yeah.
6        MR. WARFIELD:  Is that deed in
7  here, Joe?
8        THE WITNESS:  You don't have
9  that one.
10       MR. SAWYER:  I don't know.
11       MR. WARFIELD:  And I'll make a
12 copy of this later and give you back your
13 original.
14       MR. SAWYER:  What we're going
15 to do, Mr. Brooks, is he's entitled to have
16 a copy of that, but I'm going to ask him to
17 make a copy of it and give you your
18 original back, okay?
19       THE WITNESS:  Okay.
20       MR. WARFIELD:  I'll just set it
21 aside for right now, and we'll get to that
22 in a minute.
23   Q.   (BY MR. WARFIELD:)  Do you

Page 59

1  remember what you paid for the property?
2  Talking about 120 Hubbard.
3    A.   When I got it, it was a
4  fixer-up type property.  I think I paid
5  $8,000 for it.
6    Q.   And at the time you purchased
7  it, did you take out a mortgage on it?
8    A.   Yeah.  Through IAM Credit
9  Union.
10   Q.   IAM Credit.  All right.  Now,
11 how about the 410 Hubbard Street?  Did you
12 buy that at the same time?
13   A.   Yes.
14   Q.   Did you buy it from the same
15 people?
16   A.   No.
17   Q.   Who did you buy that one from?
18   A.   I bought it from Geraldine C.
19 Bristow.
20   Q.   Bristow.  Okay.  I've seen that
21 in the --
22   A.   And Cottrill Bristow.
23   Q.   Do you recall what you paid for

Page 60

1  that property?
2    A.   I think I paid Ms. Bristow
3  $6,000 for that piece of property.
4    Q.   And did you buy it -- I know
5  you said the same time.  Did you buy these
6  on the same day?
7    A.   I think -- I can't remember if
8  we settled on the same day or the next day.
9  Because this was done on the 6th day right
10 here.  The 6th of November.  So it had to
11 be on different dates.
12   Q.   Okay.  Different dates.  But
13 the same time frame?
14   A.   Yeah.
15   Q.   Okay.  And what about the 415
16 Ice Street?
17   A.   Okay, 415 Ice Street was
18 bought -- I think it was bought the same
19 day of this Woodard property.
20   Q.   Now, are two of these
21 properties actually on the same parcel for
22 tax purposes?
23   A.   What happened, they three

Tyler Eaton Morgan Nichols & Pritchett, Inc.
800.458.6031                                           http://www.TylerEaton.com

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

Page 61

1   different lots.
2       Q.    They're three entirely separate
3   properties?
4       A.    Yes.  What happened, the
5   Woodard property, it had a house on it by
6   itself when I bought it.  Then later on I
7   bought a house and moved it over on the end
8   of, which was 415 Ice Street.
9       Q.    So 120 Hubbard and 415 Ice
10  are --
11      A.    They're hooked together in
12  property, but they run from street to
13  street.
14      Q.    Okay.
15      A.    So 120 Hubbard already had a
16  house on it that the Woodards had.  But 415
17  Ice wasn't property on it when I first
18  bought it.
19      Q.    There was no building?
20      A.    No building.
21      Q.    Okay.
22      A.    So I bought a building and put
23  on there.  I bought a house and put over

Page 62

1   there.  Same thing at 410 Hubbard Street.
2       Q.    Same thing meaning you moved a
3   house on to it?
4       A.    I moved a house on to it.
5       Q.    Where did you get the houses
6   that you moved there?
7       A.    I bought it from Old Man
8   Chisolm.  He owned Chisolm Truck Stop in
9   Brundidge.  You remember Mr. Chisolm?  I
10  can't think of his last name.  But
11  Chisolm -- see, you just ask anybody about
12  Chisolm Truck Stop and Old Man Chisolm.
13  But I can't think of his last name.
14      Q.    But he had houses somewhere?
15      A.    What happened is he had these
16  houses.  He was fixing to build something,
17  and he had these two houses there.  And he
18  sold these houses so he could build
19  whatever he was going to build.  Something
20  he was fixing to build.  It been a good
21  while.  And I bought them houses from him.
22      Q.    Okay.  So he wanted to do
23  something else with the land?

Page 63

1       A.    Right.
2       Q.    So he sold the houses off the
3   land to you?
4       A.    To me.
5       Q.    And you moved them?
6       A.    And I moved them to Troy.
7       Q.    What's it cost to move a house?
8       A.    Okay, I paid -- his name was
9   Jacobs.  I paid him $2,500 to move one
10  house.  And the larger house, I paid him
11  $3,000.
12      Q.    Okay.
13      A.    And that, by the way, you asked
14  me about a lawsuit.
15      Q.    Yes, sir.
16      A.    I sued him.  Jacobs.
17      Q.    Mr. Jacobs?
18      A.    Yeah.  I sued him because he
19  moved a house down on another man's land
20  and supposed to carry them on to Troy and
21  left them there about six months.  And when
22  I filed suit, he went and moved them on to
23  the property.  And so I got a judgment of

Page 64

1   $11,000 on him, but he didn't have nothing.
2   I never did get no money out of it.
3       Q.    Let me make sure I follow you
4   on that.  He was supposed to move your
5   houses, and he didn't do until you sued?
6       A.    Yeah, I paid him to move.
7       Q.    Okay.
8       A.    But he moved up -- what he did,
9   he moved them like the back way -- it was
10  down there by Ozark.  He moved them the
11  back roads.  And he talked to a guy about
12  letting him just set it there -- it was
13  close to night -- out in a field.  He was
14  going to come and get it.
15           Okay.  He never did.  So the
16  others he let it stayed down there a long
17  time on Mr. Chisolm's land.  Mr. Chisolm
18  said well, now, you got to move it.  And he
19  never would move it.  And then when I filed
20  charges, I filed on him not moving it from
21  off of that man's land and not moving it up
22  there.
23           He moved them quick when he

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                          http://www.TylerEaton.com

Page 65

1  found out. But I got an $11,000 judgment,
2  and I didn't get nothing out it.
3      Q.    But he did ultimately move the
4  houses?
5      A.    He ultimately moved them on to
6  Ice Street and 410 Hubbard Street.
7      Q.    So he got the houses there?
8      A.    Right.
9      Q.    It took him till after you sued
10 him?
11     A.    Right.
12     Q.    What was your intention of what
13 you were going to do with the properties?
14     A.    They was rental property.
15     Q.    Rental properties?
16     A.    Um-hmm.
17     Q.    Okay. Have you ever lived at
18 any of those three properties?
19     A.    The 410 Hubbard Street property
20 was going to be my personal dwelling.
21     Q.    It was going to be?
22     A.    Yeah. I've stayed there some.
23     Q.    410 Hubbard?

Page 66

1      A.    Right. But I had done, you
2  know, start sure enough remodeling it
3  forever.
4      Q.    When was the first time you
5  actually lived at the 410 Hubbard Street
6  property?
7      A.    I lived there several times.
8  Before this even thought about coming up.
9      Q.    Tell me the last time you lived
10 there.
11     A.    The last time I lived there was
12 right after the storm.
13     Q.    Which storm?
14     A.    Before the storm. Before the
15 last storm that hit it. Right before that
16 storm. Because I was fixing -- I was
17 remodeling the bathroom and something
18 before that storm come that day. I'm
19 trying --
20     Q.    We've had a lot of them. Could
21 you tell me which storm it was?
22     A.    The one that come in 2000.
23 What was that?

Page 67

1      Q.    In 2000?
2      A.    Yeah. Ivan was when?
3      Q.    Ivan was two years ago, 2004.
4      A.    That's the one. That's the
5  one.
6      Q.    Ivan was around the time that
7  this foreclosure happened.
8      A.    Right. That's when all this
9  took place.
10     Q.    Okay. So I think Countrywide
11 records had you -- we had an address of 319
12 Dean Street at that time. Is that not
13 where you were living?
14     A.    Well, see what happened, I
15 tried to tell Countrywide, but they would
16 not listen. I tried to tell them. I even
17 called the office. I spoke to the manager.
18 I said, "Sir, I have never owned any
19 property at Dean Street." And I said, "I
20 don't live at Dean Street."
21         But they -- they just
22 wouldn't -- you know, they wouldn't accept
23 it. And they kept -- but now I'll tell you

Page 68

1  what. Every time -- and they foreclosed.
2  Every time it went -- when they put it in
3  the paper, they didn't put Dean Street.
4  They put 410 Hubbard Street --
5      Q.    Right.
6      A.    -- Ice Street, and all that
7  because they couldn't find -- they knew I
8  didn't own it. So that's why I bought you
9  that --
10     Q.    Sure.
11     A.    -- document there.
12     Q.    Let me ask you this question.
13 If I had walked up to you in September of
14 2004, which was the month, I believe, that
15 Ivan came through, and I asked you where to
16 mail you a letter --
17     A.    Where to --
18     Q.    -- where would you have told me
19 to send it?
20     A.    907 North Main.
21     Q.    So at the time, you expected to
22 receive correspondence and mail at the Main
23 Street address in Brundidge?

Page 89

1 the lot. They wanted to sell the house
2 lot, and then they wanted a little bit for
3 this lot here, which was on 415 Ice Street.
4 But see, it run from one street to the
5 other street. This is Hubbard Street, and
6 this is Ice Street. But this lot runs
7 straight across.
8    Q.   Okay.
9    A.   It's a hundred and something in
10 the front, and it comes down about eighty
11 in the back. And that's where I put that
12 other house at over here. It was already a
13 house right here.
14    Q.   Okay.
15    A.   Okay? And you come on down the
16 street around the curve at 410 Hubbard
17 Street, on down the hill here, and it sets
18 over here. And actually, that's two lots.
19 I bought both of them, you know what I'm
20 saying? I bought both of them lots. And
21 my house set right in the middle. I put
22 that house on there.
23    Q.   Okay. And it is 415 Ice and

Page 90

1 120 Hubbard that are on the same stretch?
2    A.   Right, right.
3    Q.   Are there houses on either of
4 those properties right now?
5    A.   Well, the city went over there
6 and tore them down after, you know, the
7 storm hit them and I didn't get the money
8 that I thought I was going to get to fix
9 them up from the insurance company.
10    Q.   The city tore down the houses
11 on 415 Ice --
12    A.   All three of them.
13    Q.   All three of them?
14    A.   Um-hmm. The city of Troy did.
15    Q.   The city tore down your house
16 that was worth $54,000?
17    A.   Well, see the storm had hit
18 them. When the storm hit them, they wasn't
19 $54,000. Once that storm hit them, they
20 was -- some part of them was out in the
21 yard.
22    Q.   Okay.
23    A.   But I had insurance with

Page 91

1 Countrywide on these properties, and we had
2 negotiated to let the insurance pay off.
3 We even talked to the insurance man. I got
4 a letter here from Thomas. You got a copy
5 of that letter?
6    Q.   Yes, sir. I do. It think.
7       Okay. We'll get into more of
8 those details in a minute.
9    A.   I got a question.
10    Q.   Sure.
11    A.   You asked me the price of one
12 house, but you didn't ask me the price of
13 the other two houses.
14    Q.   You gave me prices for all
15 three?
16    A.   No. I gave you the price of
17 one house on 410 Hubbard Street.
18    Q.   Okay. And what was that?
19    A.   $54,000.
20    Q.   Oh, you're talking about the
21 value of the houses?
22    A.   Right.
23    Q.   You're right; I have not asked

Page 92

1 you the value of the other two houses.
2 What are those?
3    A.   Okay. The little pink house,
4 the value of it was $30,000. That white
5 house --
6    Q.   I don't know the colors. You
7 have to tell me the address, sir.
8    A.   Okay. Ice Street, the value of
9 it was $30,000.
10       MR. SAWYER: Was that the pink
11 house?
12       THE WITNESS: That's the pink
13 house on Ice Street.
14    A.   The white and green house over
15 on 120 Hubbard Street, that was a $45,000
16 house.
17    Q.   (BY MR. WARFIELD:) What do you
18 base those numbers on?
19    A.   Well, I base the numbers on
20 there's a guy was going to buy them
21 properties from me one time. And I went
22 and asked the real estate lady, you know,
23 basically what was -- and she told me by

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 149 to 152)

Page 149

1 just every night. You know, I have done it
2 for a period of time for special reasons.
3      Q.   Have you ever -- when was the
4 last time --
5      A.   I got an address for that
6 showing that I stayed there. Will that
7 help you any?
8      Q.   No. No. I'm asking you when
9 you actually lived there. You've got
10 several properties. You told me you lived
11 in different places. I need to know when
12 it was that you actually lived there.
13      A.   It was before Ivan.
14      Q.   Okay. But you told me before
15 Ivan that you were really living with your
16 mother.
17      A.   That's what I told you.
18      Q.   Okay. When did you really live
19 at the property on Hubbard Street?
20      A.   Like I told you, I never just
21 straight lived there no long period of
22 time. I've had situations where my sister
23 and them would come home and stay to give

Page 150

1 me a break with Momma. Well, I would go up
2 there and stay because I didn't want to
3 stay down there with them and the children.
4      Q.   So you'd go up there and stay
5 for periods of time?
6      A.   Right.
7      Q.   But you never really lived
8 there?
9      A.   No. No. If that's what you --
10 if you don't count the periods that I
11 stayed there, that's fine.
12      Q.   When was the first time you
13 recall hearing anything about foreclosure
14 on any of these three properties?
15      A.   Well, it was way on after I
16 went into Montgomery up here and I had
17 heart surgery. I had my heart worked on.
18 And then they closed Dorsey Trailer. After
19 they closed Dorsey Trailer.
20      Q.   Do you remember who you first
21 heard anything about foreclosure from?
22      A.   Yeah.
23      Q.   Who was that?

Page 151

1      A.   Beth from Countrywide. She
2 told me that they had sent her a letter
3 down there saying that they was going to --
4 you know, that they was fixing to foreclose
5 on the property.
6      Q.   Okay. Let me ask you one
7 question. Are you aware of Countrywide
8 ever attempting to foreclose on the
9 property on Dean Street?
10      A.   No, because they don't own it.
11      Q.   Okay. I agree with you. I
12 just want to make sure.
13      A.   But they said they was. They
14 said they was. But they couldn't foreclose
15 on it because I ain't never owned it and
16 they ain't never owned it.
17      Q.   When did they say they were
18 going to foreclose on it?
19      A.   Well, Gloria, I think she going
20 to take care of that in a few months.
21 Because they messed up her name, and she
22 ain't never had no dealings with
23 Countrywide. And they -- they writ me a

Page 152

1 letter one time saying -- they kept writing
2 letters that I owned. I tried to explain
3 it to them. I said I don't own. And then
4 when they come out with it, they come out
5 in the paper showing where the property
6 was.
7      Q.   Right. That's what I'm asking.
8 Do you have anything in which Countrywide
9 said it was going to foreclose on the Dean
10 Street property?
11      A.   I'll get it to him. I got
12 something. I'll get it to him.
13      Q.   Describe what it is that you're
14 telling me about.
15      A.   I got some papers showing that
16 they said they was going to foreclose Dean
17 Street.
18      Q.   Was it just stuff sent to you
19 at Dean Street, or did it say they were
20 going to foreclose Dean Street?
21      A.   It was stuff sent at Dean
22 Street saying they was going to foreclose.
23      MR. SAWYER: Get that to me.

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 153 to 156)

Page 153

1  I'll get it to you.
2      A.    And she went down there, and
3  she checked with the people on it.  They
4  said, "Well, just go ahead; let them try."
5          MR. SAWYER:  Is that Gloria out
6  there?
7          THE WITNESS:  Yes.
8      Q.    (BY MR. WARFIELD:)  Are you
9  aware of there ever being any foreclosure
10 proceedings -- any notice, any sale -- on
11 the Dean Street property?
12     A.    Never.
13     Q.    Okay.
14     A.    After that letter that they
15 sent me from Countrywide.  That's the only
16 thing I ever knew about foreclosure on Dean
17 Street.  Dean Street ain't never been
18 behind.
19     Q.    All right.
20     A.    And that was property they was
21 trying to foreclose on that they didn't own
22 and I ain't never owned.  And, you know, I
23 was surprised.  And I tried to explain it

Page 154

1  to them, but they didn't listen.
2      Q.    What is --
3      A.    All you got to look at, this
4  letter right here shows "Roy Brooks, Jr.,
5  319 Dean Street."  And "property address,
6  319 Dean Street."  That will take care of
7  that right there.  Showing that they was
8  trying to foreclose Dean Street.  There you
9  a copy.
10     Q.    Okay.  Does that letter say
11 anything about foreclosure?
12     A.    It said they paid off the loan.
13 I got something -- okay.  "This letter is
14 to confirm the amount that your insurance
15 company sent to pay off your mortgage.  We
16 received $9,287 on December 31, 2004.
17 Property address 319 Dean Street, Troy,
18 Alabama."  That's another one.
19     Q.    Okay.  Does that say anything
20 about foreclosure?
21     A.    No, they just paid it off.
22     Q.    My question was --
23     A.    Oh.  Okay.  Foreclosure.  Okay,

Page 155

1  hold it.  Just a minute.  Hold it just a
2  minute.  I got something.  Hold it just a
3  minute.
4          That's one right there.  I got
5  others.
6      Q.    Okay.  Thank you, sir.  All
7  right.
8      A.    You want a copy of this?
9      Q.    Yeah, I will.  Can you set them
10 aside?  All right.
11         I want you to back up with me,
12 Mr. Brooks, and just tell me -- walk me
13 through what happened with the
14 foreclosures.
15     A.    Well, like I say --
16         MR. SAWYER:  Sit back and relax
17 and tell him what happened.  Think about
18 what he's saying.
19     A.    Okay.  Like I say, when I got
20 the letter from Countrywide that they was
21 going to -- I got a letter from Macbeth --
22 McFadden and Rouse saying that they was
23 representing Countrywide and that they was

Page 156

1  fixing to foreclose the loan.  I called her
2  up and asked her, you know, how much money
3  could I get in -- get up to stop it.  She
4  told me approximately what I'd have to get
5  up, plus there would be so much a day, plus
6  she'd have to call back up to Countrywide
7  to stop it; that Countrywide was the only
8  people that could stop it.  And I asked her
9  is there any way to work it out.  She told
10 me that they had a workout department at
11 Countrywide, say but they was representing
12 Countrywide at this time; that I need to
13 talk to her and make the offer that I got
14 to offer, what I could come up with.
15         So one day at the house, I just
16 turned around and called the workout
17 department and told them what had happened
18 to me and what I had been through and they
19 had closed Dorsey down and I had a whole
20 bunch of children in school and all this
21 other stuff and some in college, and I had
22 had work done on my heart, and I needed to
23 see if I could work it out.

Tyler Eaton Morgan Nichols & Pritchett, Inc.

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 157 to 160)

Page 157

1  And Countrywide sent me a
2  workout letter saying that -- I mean, you
3  know, they talked to me on the phone, plus
4  I got a workout letter here from
5  Countrywide. You got one of these? Saying
6  that -- okay.
7      Q.   That's actually the letter you
8  just handed me. If it's okay, I'll just
9  mark that copy.
10     A.   But I got that copy of that
11 check on the inside. Can we get a copy of
12 that back?
13     Q.   Yes, it's on there, too.
14     A.   Copy of the check?
15     Q.   Yes.
16     A.   Yeah, okay.
17     Q.   All right. So Countrywide sent
18 you a letter offering to let you work out
19 the delinquency on the loan?
20     A.   That's what they said. And
21 then they called back and told me they
22 would be unable to do it. I don't know
23 what reasons -- the reason was.

Page 158

1      Q.   Did they say and you just don't
2  remember them? Or did they not?
3      A.   Well, I asked her. She told me
4  that it had got -- I told her who I was
5  working with, the guy's name. And she told
6  me that it had gotten to the place and the
7  time from the letter I had the date of the
8  foreclosure, that I needed to work through
9  Ms. Beth.
10     Q.   Okay.
11     A.   Through McFadden -- you know,
12 the lawyer, their lawyer that was
13 representing --
14     Q.   They told you you had to
15 reinstate?
16     A.   No, they didn't tell me that.
17     Q.   Okay.
18     A.   They told me I had to work
19 through the lawyer that was representing
20 them. They called it the legal department.
21     Q.   All right. So let me just back
22 up. You first heard from Beth Rouse?
23     A.   Right.

Page 159

1      Q.   Okay. You asked her if there
2  was any way you could avoid the
3  foreclosure?
4      A.   Right.
5      Q.   She told you you had to talk to
6  the workout department?
7      A.   Right. At Countrywide.
8      Q.   At Countrywide. You called the
9  Countrywide workout department?
10     A.   Um-hmm.
11     Q.   Who did you talk to? Do you
12 remember?
13     A.   Wait. Could I back up a
14 minute?
15     Q.   Sure.
16     A.   When I first talked to
17 Ms. Beth, she told me that she -- you know,
18 the pros and the cons of what I needed to
19 come up with. And then one day I was
20 sitting there. I was worried about it.
21 And I went over her head, and I called the
22 workout department. I called somebody
23 there and I asked her and they told me they

Page 160

1  had a place, one of the workers, that you
2  can work it out. Then I called the workout
3  department. And then they told me to start
4  sending in documents. And I start sending
5  in documents. Then later on I called. I
6  had till that Friday. They was going to
7  let me know that Friday. And when I called
8  back that Friday, the workout department at
9  Countrywide, they said it had gone too far;
10 I'm going to have to deal with Ms. --
11     MR. SAWYER: Rouse.
12     THE WITNESS: Ms. Rouse.
13     Q.   (BY MR. WARFIELD:) They didn't
14 tell you that they couldn't give you a
15 workout option because you didn't have
16 enough money to pay up front to qualify for
17 the plan?
18     A.   No. She told me that it had
19 gone too far and it was getting so close to
20 the deadline for the foreclosure that I
21 needed to work it out with her; that only
22 she could stop the foreclosure.
23     Q.   Do you remember who you talked

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 165 to 168)

Page 165

1      A.    And she sent me something.  And
2  about three or four more of them here sent
3  me something.  You got a copy of that
4  letter.
5      Q.    And I do have that letter.  And
6  I appreciate that.  And I'm going to come
7  back to that.  I want to ask you a bunch of
8  questions about that process.  But that was
9  in March of 2005, okay?
10     A.    Yeah.
11     Q.    Is that correct?
12     A.    Right.
13     Q.    Okay.  You told me before that
14  you talked to some people about a workout
15  before the foreclosure.  And that's what
16  I'm asking you about right now.
17     A.    And they didn't put the name on
18  here.
19     Q.    Okay.  And that's fine.  Do you
20  remember the names of anybody that you
21  talked to at that time?
22     A.    I can't remember, but they sent
23  the documents here for the record to show

Page 166

1  that they was dealing with me.
2      Q.    Right.  And I understand that.
3  I'm just asking who you dealt with if you
4  remember?
5      A.    But I don't know.  But I got
6  this document here to show for the record
7  that somebody was working with me from the
8  workout department of Countrywide Home.
9  You know, guaranteed document here from
10  them.
11     Q.    Did you ever receive a workout
12  agreement or a workout plan from
13  Countrywide?
14     A.    I never received a workout
15  plan.  Because I told you when it got --
16  they told me it had got too far.  I had to
17  go back through their lawyers.
18     Q.    Okay.  What did Ms. Rouse say
19  when you went back and talked to her after
20  that?
21     A.    What did Ms. Rouse say?
22     Q.    Um-hmm.
23     A.    If I -- after they told me that

Page 167

1  they couldn't handle it, I knew what she
2  had said at first, so I didn't go back to
3  Ms. Rouse.  I went to the lawyer and told
4  him about the insurance.  Then he -- I paid
5  him.  He said okay; said, "I know
6  Ms. Rouse."  And he called her, and they
7  talked.
8      And then he told me about this
9  insurance and stuff.  He told her first.
10  And she said, "Okay, we going to try to
11  hold it off and see what they going to do."
12  And then when we got this other letter from
13  them again stating how close -- that I
14  think it was going to be like three or four
15  days, four days from then -- all right?  I
16  went back to him.
17      Then he called this insurance
18  man -- well, I'm repeating myself -- right
19  back up here in Montgomery.  The man got on
20  speaker phone and say, "Sure."  He say,
21  "I'm working it up.  It will be enough to
22  take care of the loan on them houses."  And
23  he said, "Well, could I get you to call and

Page 168

1  tell Ms. Beth?"  He said, "Yes, I'll call
2  and tell her."  And he said, you know --
3  the way he was talking, like he was
4  stressing to do that.  But he said, "I'll
5  call."
6      So she called back, and she
7  talked to the lawyer.  And as far as we was
8  concerned, that she was working with me.
9  And all of a sudden, I find out that that
10  thing was fixing to foreclose.
11     Q.    How much was the loan at the
12  time, do you know?
13     A.    I really don't.
14     Q.    Okay.  Do you know which --
15     A.    The total loan?  It shouldn't
16  have been much.  She got -- she said I owe
17  $54,000.  Ms. Beth said I owe $54,000.  She
18  said I owe Countrywide $54,000.
19     Q.    She said that on the phone?
20     A.    No, she got it in a document
21  here.  She got it right here.  She got it
22  on the document here.  She got a document
23  here showing exactly how much I owe

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                    http://www.TylerEaton.com

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 169 to 172)

Page 169

1    Countrywide.  She says, "Total amount for
2    redemption is $43,970."
3         MR. WARFIELD:  Okay.  I've got
4    a copy of that same letter.  I'm going to
5    mark it as Exhibit 10.
6         (Whereupon, Defendant's
7         Exhibit 10 was marked for
8         identification.)
9    Q.    (BY MR. WARFIELD:)  Exhibit 10
10   is a March 31st, 2005 letter from Beth
11   McFadden Rouse to James N. Thomas.
12   James N. Thomas was your attorney, right?
13   A.    Um-hmm.
14   Q.    That's a letter in March of
15   2005?
16   A.    Um-hmm.
17   Q.    Telling you how much it would
18   cost to redeem the properties?
19   A.    Um-hmm.
20   Q.    And total is $43,970.
21   A.    $43,970.38.
22   Q.    But that's March of 2005,
23   right?

Page 170

1    A.    That's right.
2    Q.    That's several months after
3    foreclosure.
4    A.    Right.
5    Q.    Do you know how much the loan
6    balance was at the time of foreclosure?
7    A.    It couldn't have been much
8    because they sold it for $6,000.  They
9    foreclosed on it and didn't get but $6,000
10   for that.
11   Q.    Okay.  Now, do you know which
12   loan they were foreclosing?
13   A.    Oh, they was handling two?  I
14   didn't know they was handling two.
15   Q.    Which loan did you think they
16   were foreclosing?
17   A.    I thought they were foreclosing
18   on the loan over there on Hubbard Street
19   and Ice Street and all that stuff.
20   Q.    And those are the properties
21   that you had -- which mortgage did you
22   think they were foreclosing?  The IAM
23   mortgage?

Page 171

1    A.    No.  I got the paper here
2    showing which one they closed on.
3    Q.    Okay.
4    A.    And you have, too.  Because I
5    sent it to you.  I gave it to you.  And the
6    newspaper and all.  You got a copy of that
7    newspaper?
8         MR. WARFIELD:  I'm sure I do.
9    Hold on one second.  I'll mark this as
10   Exhibit 11.
11        (Whereupon, Defendant's
12        Exhibit 11 was marked for
13        identification.)
14   Q.    (BY MR. WARFIELD:)  That's a
15   newspaper article, notice of foreclosure
16   sale.  That refers to the Small Business
17   Administration mortgage.
18   A.    Yeah.  What it was referring
19   to, what mortgage, who had it first.  And
20   they got -- you don't see IAM in here, too?
21   Let me get that for you.  They got IAM in
22   here.  They got LPP.  Because they couldn't
23   close on -- well, they could.  First

Page 172

1    mortgage.  They done took some stuff out of
2    here.  But I got one.  I got one with the
3    IAM.  It shows IAM.  It shows Beal Bank.
4    It shows all of them.  Small Business
5    Administration, mortgage book, LPP.  I got
6    my own.  I got my own.  Hubbard Street.
7    425 parcel.  Okay, I got one.  I got one.
8    I got one and you have, too, with IAM on
9    it.  Because we just got through looking at
10   while ago showing IAM Credit Union as first
11   mortgagor and all that stuff.
12        Okay.  Okay.  "Subject to first
13   mortgage executed by Roy Brooks, Jr., an
14   unmarried man, Federal Credit Union,
15   February 11, 1944."  This the foreclosure
16   right here.  IAM Federal Credit Union was
17   the main lender.
18        MR. SAWYER:  This is a
19   foreclosure deed.
20        THE WITNESS:  Yeah.
21        MR. SAWYER:  Auctioneer's deed.
22   Q.    (BY MR. WARFIELD:)  Do you know
23   what day it was foreclosed?

Page 173

1      A.   No, I don't because it supposed
2   to been done the 10th, and they done it
3   another day.
4      Q.   I tell you I think that will
5   show you it was done on November 10th.
6      A.   They dated it that, but they
7   wasn't there because we was at the
8   courthouse.  We waited on them to
9   foreclose.  I can prove that by the probate
10  judge and my cousin.  We stayed there all
11  day.  They didn't foreclose that day.  They
12  wrongfully really foreclosed because they
13  supposed to gave me a chance to bid on it.
14          MR. SAWYER:  This is what day
15  they say, okay?
16          THE WITNESS:  Yeah, but they
17  wasn't there.
18          MR. SAWYER:  Just tell him.
19      A.   Okay.  This is the date that
20  they say.  "Sealed the 10th day of November
21  2004."
22      Q.   (BY MR. WARFIELD:)  Okay.
23      A.   But they wasn't there that day.

Page 174

1      Q.   Okay.
2      A.   And the records show the 12th
3   of 30, 2004.
4          MR. SAWYER:  That's when it was
5   recorded, I think.  That's when it was
6   recorded.  This is the day that they say,
7   if I'm reading this correct, that it was
8   ultimately done.  All right?
9          THE WITNESS:  Right.
10      Q.   (BY MR. WARFIELD:)  Back up
11  with me, and we'll get into that in a
12  minute.
13          You've told me about talking to
14  Beth Rouse, right?
15      A.   Yes, I did.
16      Q.   You've told me about talking to
17  a couple people in the workout department?
18      A.   Yes, that's right.
19      Q.   You've told me about talking to
20  your attorney?
21      A.   Right.
22      Q.   And y'all talking to this
23  insurance guy.

Page 175

1      A.   Right.
2      Q.   Okay.  Before the foreclosure,
3   did you talk to anybody else at Countrywide
4   or with Countrywide about the foreclosure
5   or about the insurance or any of this
6   stuff?
7      A.   Before when?  Rephrase --
8      Q.   Before the foreclosure sale.
9   Before November 10th.
10      A.   Before November 10th?  I've
11  talked to other peoples in the workout
12  department because they sent me letter
13  to --
14      Q.   You showed me the letter you
15  got from them, and you've told me about the
16  two people you talked to there.  Other than
17  those people, other than the ones you've
18  already told me about, did you talk to
19  anybody else at Countrywide?
20      A.   I can't remember, sir.
21      Q.   Okay.
22      A.   I can't remember.
23      Q.   And as I told you before, I

Page 176

1   want to go forward and talk about some of
2   the people you talked to afterwards.  We'll
3   get to that in a minute.  I just want to
4   make sure you've told me everything about
5   what happened before the foreclosure.
6      A.   Right.
7      Q.   Is there anything else?  Did
8   you talk to anybody at Beal Bank?  Did you
9   talk to anybody at IAM Credit Union?
10      A.   Beal Bank told me they didn't
11  have it.  I called down there and talked to
12  a lady.  And I didn't ask her her name.
13  She just told me that they didn't have the
14  loan, that Countrywide had the loan.
15      Q.   Okay.  And do you know which
16  loan they meant?  Was it the Small Business
17  loan or the IAM loan?
18      A.   Well, she told me that their --
19  that they had two loans, and both loans had
20  went to Countrywide.
21      Q.   Okay.  So Beal Bank told you
22  they had two loans?
23      A.   Right.

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 181 to 184)

Page 181

1  you talked to before the foreclosure about
2  the foreclosure or about these properties
3  or your insurance claim or any of that
4  stuff?
5      A.    Like I said, you know, all the
6  people I talked to was over at Countrywide.
7      Q.    Okay. And we're going to talk
8  about those some more, the folks
9  afterwards. But as of November 10th, 2004
10 when this foreclosure happened, have you
11 told me everybody that you could remember
12 talking to at Countrywide?
13     A.    Before --
14     Q.    Before the foreclosure?
15     A.    Yeah.
16     Q.    Okay. Thanks. All right.
17 Now, I know you talked to some folks
18 afterwards, too.
19     A.    Yeah.
20     Q.    All right. I tell you what.
21 I'm going to go through some documents with
22 you, and hopefully that will help us stay
23 on a time line here.

Page 182

1          (Whereupon, Defendant's
2          Exhibit 12 was marked for
3          identification.)
4      Q.    (BY MR. WARFIELD:) I show you
5  Defendant's Exhibit 12. Have you ever seen
6  that document before?
7      A.    Mrs. McFadden Rouse. I told
8  you I talked to her.
9          MR. SAWYER: Listen to his
10 question.
11         THE WITNESS: Oh.
12     Q.    (BY MR. WARFIELD:) Have you
13 ever seen that before?
14     A.    No, I haven't.
15     Q.    It's addressed to you at a
16 P.O. Box. Do you recognize that?
17     A.    I ain't got -- I been -- I lost
18 that P.O. Box. And if it came there, I
19 didn't get it.
20     Q.    When did you have that
21 P.O. Box?
22     A.    I ain't had that P.O. Box in
23 about three or four years.

Page 183

1      Q.    Okay. Now, that letter is
2  dated in 2002.
3      A.    Well, I ain't had it in three
4  or four years. I didn't get this letter.
5      Q.    Do you know when you no longer
6  had that P.O. Box?
7      A.    I can go to the post office,
8  but I guarantee you it's about three or
9  four years. It's been about three or four
10 years since I had that P.O. Box.
11         MR. SAWYER: Just get me that
12 information, and I'll --
13         THE WITNESS: Okay.
14     Q.    (BY MR. WARFIELD:) As you sit
15 here, you don't have that P.O. Box?
16     A.    I don't know when that was, but
17 I know it's been at least three years and a
18 half since I had that P.O. Box, close to
19 four years.
20     Q.    And this letter was written
21 more than four-and-a-half years ago. What
22 was Post Office Box 691 in Troy, was that
23 at some point a mailing address for you?

Page 184

1      A.    Yes.
2      Q.    But you don't recall having
3  seen this letter from Ms. Rouse?
4      A.    No, I don't.
5      Q.    Okay.
6      A.    But could I ask a question?
7      Q.    Yes, sir.
8      A.    Since we got on this letter
9  here, they didn't foreclosure then. What
10 that got to do with Countrywide?
11         MR. SAWYER: Just listen to his
12 question.
13         MR. WARFIELD: I'm not sure I
14 know the answer.
15         (Whereupon, Defendant's
16         Exhibit 13 was marked for
17         identification.)
18     Q.    (BY MR. WARFIELD:) I show you
19 Defendant's Exhibit 13. That's a letter
20 from 2004 from Ms. Rouse.
21 Let me ask you this. How did
22 you first hear from Ms. Rouse? How did you
23 first come across her?

46

Page 185

1      A.    She writ me a letter, told me
2  that she representing Countrywide.
3      Q.    Okay.  Do you have a copy of
4  that letter or --
5      A.    No, I don't.
6      Q.    Okay.  Might the letter you're
7  holding be such a letter?
8      A.    Uhn-uhn.  This ain't it.
9  Because the letter -- the letter I got from
10 her, the copy showing what I have to pay
11 is -- where this was sent to?  691.  I
12 didn't even have that box then, sir.
13     Q.    Well, tell me where did you get
14 a letter from her?
15     A.    I got the letter that she sent
16 to 319 Dean Street.
17     Q.    That Ms. Rouse sent to 319 Dean
18 Street?
19     A.    Yeah.  And she sent one, I
20 think, down to P.O. Box 691.  Because I
21 ain't had that box in a long time.  I'll go
22 by the post office and get it, get you some
23 documents.

Page 186

1             (Whereupon, Defendant's
2             Exhibit 14 was marked for
3             identification.)
4      Q.    (BY MR. WARFIELD:)  I show
5  Exhibit 14.  Have you ever seen that
6  document before?
7      A.    LPP.  Who is LPP?  Yeah, I saw
8  it after the foreclosure.  I saw this after
9  the foreclosure.
10     Q.    That letter specifically?
11     A.    I don't know about this letter.
12 I couldn't have saw it because I ain't got
13 that post office box.
14     Q.    If you would, take a second and
15 look through your documents, please, sir,
16 and tell me if you have any correspondence
17 from Beth Rouse?
18     A.    Okay.  All right.
19            Yeah, I have one right here.
20 And she -- but it went to 319 Dean Street.
21     Q.    Mind if I see it?  Okay, the
22 letter you just handed me is one she sent
23 to your attorney, right?

Page 187

1      A.    She sent it to me.  319 Dean
2  Street.
3      Q.    Well, sir, this letter you just
4  handed me is addressed to your attorney.
5      A.    Oh, that's attorney Thomas.
6  But see, I saw 319 Dean Street right here.
7  And I was thinking that was some of the
8  stuff that she --
9      Q.    I understand.  If you can find
10 any correspondence from Ms. Rouse addressed
11 to you, I would appreciate it.
12     A.    All right.  Now, this is from
13 McFadden and Rouse right here that she
14 sent.
15            MR. WARFIELD:  While you're
16 looking, for the record, I have two
17 Exhibit 9s marked.  So I am going to
18 mark -- Exhibit 9 is a letter from
19 Countrywide to Roy Brooks on August 3rd
20 2004.  I'm going to leave that as
21 Exhibit 9.  I'm going to change the
22 affidavit of ownership to real property
23 that Mr. Brooks and I read from that was

Page 188

1  dated February 1, 1996, I'm going to mark
2  that as Exhibit 9A.
3             (Whereupon, Defendant's
4             Exhibit 9A was marked for
5             identification.)
6      A.    I have -- may I say something?
7      Q.    (BY MR. WARFIELD:)  Yes, sir.
8  Absolutely.
9      A.    I have a copy here from
10 Countrywide Home Loans to Roy Brooks, 907
11 North Main Street, Brundidge, Alabama.
12     Q.    Okay.  Again, I'm just asking
13 if you have any correspondence to you from
14 Ms. Rouse.
15     A.    That look like one there.
16 That's the only way I can get it is she
17 sent it to me.  That's McFadden and Rouse
18 right here that she sent to me.  See that?
19     Q.    That's the foreclosure deed,
20 right?
21     A.    Yes.  She had to send it to me.
22 That's the only way I can get it.
23     Q.    Okay.  Well --

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 193 to 196)

Page 193

1  any of those before?
2      A.   I ain't seen the one at 410
3  Hubbard Street. I don't remember it.
4      Q.   Let me ask you this question.
5  Was anybody living at any of those
6  properties in August of 2004?
7      A.   I had -- I can't remember.
8          MR. SAWYER: Would you look at
9  your records and ascertain whether or not
10 anybody lived or rented those properties.
11 And that is a good question that he is
12 entitled to an answer to. Find out.
13         THE WITNESS: Because I know
14 one girl was living, but I don't --
15         MR. SAWYER: Don't speculate.
16         THE WITNESS: Okay.
17     Q.   (BY MR. WARFIELD:) You said
18 you purchased these to be rental
19 properties? Okay. That's a yes?
20     A.   Hmm?
21     Q.   That's a yes?
22     A.   Yes.
23     Q.   How do you keep up with rental

Page 194

1  income?
2      A.   How do I keep up with the rent?
3      Q.   Do you keep books of them in
4  any way?
5      A.   Well, I tell you what. I had
6  some bad tenants. I go by there -- when it
7  first started off -- you know it's been
8  many years -- everything went good. But in
9  later years, I go by there, they pretend
10 their baby fell out the bed and he had to
11 go to the doctor. And this and that and
12 the other happened. And they say, "Can I
13 give you $50 today, and if you come back,
14 I'll have all your money next week." You
15 run back over there next week. Somebody
16 come to the door say, "She was here, but
17 she just left." It just been a scenario.
18     Q.   I understand. And I'm
19 following up on your attorney's suggestion.
20 I'm just asking what kind of records you
21 keep. What would you go to look at to find
22 out if and when there was a tenant in any
23 of these properties?

Page 195

1      A.   I got one book I can look at I
2  think.
3      Q.   What kind of a book?
4      A.   It's a receipt book.
5      Q.   Okay. So do you record that
6  income like in your taxes?
7      A.   Yeah.
8      Q.   Do you have an accountant?
9      A.   No, I don't have one now.
10     Q.   Who prepares your tax returns
11 for you?
12     A.   Who prepare them for me?
13     Q.   Do you do them yourself?
14     A.   Well, me and another fellow do
15 it.
16     Q.   Who is the other fellow?
17     A.   Reverend Reynolds help me out.
18     Q.   He just helps you file your
19 returns, or do you guys have any joint
20 investments of any kind?
21     A.   No. He just help me file my
22 return.
23     Q.   But you do declare any income

Page 196

1  from these houses?
2      A.   Yeah.
3      Q.   Do you also deduct expenses
4  from these houses?
5      A.   Yeah.
6      Q.   Okay. And you keep all that
7  stuff in some sort of a book?
8      A.   What happened, I don't know
9  where I got it now because I had a bunch of
10 that stuff in the back of my car, and it
11 caught afire and burned up. So I don't
12 know whether I got all of it, but I got
13 some of it.
14         MR. SAWYER: Would you look and
15 see?
16         THE WITNESS: I'll look and
17 see.
18     Q.   (BY MR. WARFIELD:) If you
19 would, please provide your attorney any
20 records you have about any rental income or
21 rent costs for these properties going back
22 five years if you don't mind.
23     A.   Okay.

49

Tyler Eaton Morgan Nichols & Pritchett, Inc.

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 209 to 212)

Page 209

1    specific day. It's been a long time, and
2    I'm --
3        Q.    I understand that.
4        A.    And, you know, I ain't no baby.
5    And I just -- verbatim date. I'm telling
6    you the best I can remember.
7        Q.    And Mr. Brooks, I can assure
8    you that's all I'm asking you to do. I
9    only want your best recollection.
10       A.    Yeah. If I knew, I'd just tell
11   you straight out. I'm trying to remember
12   to be as close as I can, and I think that's
13   all somebody ought to ask of me.
14       Q.    And that's all I'm asking you.
15       A.    I can't remember.
16       Q.    Okay. Do you know, though,
17   if -- when you went down and talked to the
18   attorney, you told me about this
19   conversation you had with the insurance
20   guy. You guys got on the phone and talked
21   to some guy in the insurance company?
22       A.    Yeah.
23       Q.    Had your lawyer already written

Page 210

1    a letter to Ms. Rouse at that point?
2        A.    Had he already written one to
3    her? I think so. I think he had. I
4    surely think he had. Because that's when
5    he got back the second time on the phone
6    when it got critical and talked to her.
7        Q.    Are you aware of him any
8    writing any further letters about that?
9        A.    No, I am not.
10       Q.    All right. Exhibit 20 is three
11   letters, one to each -- addressed to either
12   you or to the occupant of the three
13   collateral properties, the three subject
14   properties. Have you ever seen any of
15   those letters?
16       A.    No, I haven't. I remember
17   going down there the 10th, though. I
18   remember that well because I stayed down
19   there a long time. Then I went home and
20   ate and came back and had my cousin watch
21   it for me. I came back, and I even went in
22   there and talked to the probate judge.
23       Q.    This is the same day that you

Page 211

1    had talked to your attorney?
2        A.    When?
3        Q.    The day you're talking about?
4        A.    About him -- when this thing
5    started, I went by his office every day.
6        Q.    Okay.
7        A.    Yes, sir. I went by his office
8    every day. It wasn't I just, you know, go
9    down there every now and then. I either go
10   in the morning or in the evening and talked
11   to him about what was going on.
12            And, you know, they got this
13   here, but I don't see where nobody signed
14   it. I know I ain't sign it. Now, I wonder
15   how could it --
16       Q.    Well, you weren't living at any
17   of those properties in December of 2004,
18   were you?
19       A.    In December?
20       Q.    Right.
21       A.    Right. I told you, you know, I
22   would go there and stay, and I was
23   fixing --

Page 212

1        Q.    No, I understand. I'm just
2    asking if you've seen this before. The
3    answer is no?
4        A.    No.
5                (Whereupon, Defendant's
6                Exhibit 21 was marked for
7                identification.)
8        Q.    (BY MR. WARFIELD:) Have you
9    seen No. 21?
10       A.    Yes, I seen this.
11       Q.    Do you recognize that fax
12   number? This one here.
13       A.    Yeah. This my fax number.
14       Q.    Okay.
15       A.    She faxed it to me. She faxed
16   that thing to me. See that? That's my fax
17   number.
18            MR. SAWYER: Okay.
19            THE WITNESS: She faxed that to
20   me.
21            MR. SAWYER: What exhibit is
22   that?
23            MR. WARFIELD: That's

53

ROY BROOKS, JR.

COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.

September 15, 2006

(Pages 213 to 216)

Page 213

1  Exhibit 21.  That's a March 11, 2005
2  letter.
3       Q.    (BY MR. WARFIELD:)  Do you know
4  why she faxed that to you?
5       A.    March 11th?  Sir, there's some
6  dates been changed here.  There's some
7  stuff been done here.
8       Q.    Well, sir, in March, didn't you
9  contact Countrywide and ask for a loan
10  history and payoff information for your
11  loans?
12       A.    I only got this -- me and the
13  attorney either one didn't see this until
14  after the foreclosure, that $43,000.  I
15  ain't never seen that till after the
16  foreclosure.
17       Q.    And this is dated after the
18  foreclosure, right?
19       A.    Okay, okay.  Okay.  You got me
20  going.
21       Q.    It's a March 11, 2005 letter.
22       A.    Oh, okay.  Okay.  That's after
23  the foreclosure?  Yeah, yeah, yeah.

Page 214

1       Q.    This is written four months
2  after the foreclosure?
3       A.    We asked -- we wanted to find
4  out -- we hadn't heard nothing from the
5  insurance or nothing.  We was trying to
6  find out where everything was and what
7  happened.  And we knew if she sent us the
8  payoff, then it would tell us, you know,
9  where the proceeds went, how much they paid
10  off the loan, and how much everything.
11       MR. SAWYER:  Listen to the
12  question.
13       THE WITNESS:  Okay.
14       MR. SAWYER:  The hour is late.
15  Don't be talking without thinking and
16  looking as far as what it is.
17       THE WITNESS:  Okay.
18       (Whereupon, Defendant's
19       Exhibit 22 was marked for
20       identification.)
21       Q.    (BY MR. WARFIELD:)  Defendant's
22  Exhibit 22.
23       A.    I seen this letter.

Page 215

1       Q.    That's a letter from your
2  attorney?
3       A.    Right.
4       Q.    To Ms. Rouse.  Do you remember
5  seeing that letter before?
6       A.    I seen this letter.
7       Q.    Okay.  So as of March of 2005,
8  your attorney was asking Ms. Rouse through
9  this letter for a breakdown of the
10  insurance proceeds that had been paid?
11       A.    Right.
12       Q.    But you understand the
13  foreclosure had already happened four
14  months before then, right?
15       A.    We knew that the foreclosure
16  happened in December, but the man told us
17  that he was going to pay it off before the
18  foreclosure.
19       Q.    What month did the foreclosure
20  happen?
21       A.    It happened in November.  But
22  I'm just saying he told us that the
23  insurance would be put -- from the time we

Page 216

1  talked to him, he told us the insurance
2  would be paying them off.
3       Q.    What man said this?
4       A.    That man from Montgomery.
5  That's what we was hoping for.  We knew the
6  foreclosure happened because like I told
7  you, when he called her, she said that she
8  may can't stop the man.  So we knew the
9  foreclosure happened.  But then we thought
10  that the money was going to come down there
11  right after foreclosure and pay the bills
12  and give me the deed and what was left.
13       Q.    So the guy in Montgomery who
14  you remember being with the insurance
15  company --
16       A.    Right.
17       Q.    -- told you -- I thought you
18  said he told you he thought there would be
19  enough?
20       A.    He said there would be enough.
21  He told me there would be enough.
22       Q.    Did he say the claim was being
23  paid?

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 225 to 228)

Page 225

1    A.    He's a Rogers.  I'll get his
2   name and get it to you.  That's my cousin.
3   His sister name Esther May Rogers.  And
4   I'll get it to you.
5    Q.    But at the time you talked to
6   your attorney, and he said, "Don't worry
7   about it.  You got a year to redeem..." --
8    A.    That was -- this was all after.
9    Q.    It's late.  Right.  At that
10  point, you knew the property had been
11  foreclosed?
12   A.    Right.
13   Q.    And you were talking about
14  redeeming your property?
15   A.    Right.  Because we knew that
16  the insurance company -- see, we was told
17  that the insurance company was going to pay
18  off.  So I knew the insurance company
19  supposed to pay off and give me whatever
20  portion.
21   Q.    Okay.  And again, the insurance
22  company -- the insurance is supposed to pay
23  off.  The person who told you this is the

Page 226

1   guy from Montgomery?
2    A.    Right.
3    Q.    Did anybody else ever tell you
4   that?
5    A.    Well, they had two peoples come
6   down there.  They had more than one guy
7   from Montgomery come down there.
8    Q.    Who had more?
9    A.    The Countrywide place.
10   Q.    How do you know it's a
11  Countrywide place?  Back up.  Tell me that.
12  Is it an insurance company?  Was it your
13  mortgage company?  Do you have any idea who
14  it really was?
15   A.    The man told me who he was
16  from.
17   Q.    Okay.
18   A.    Countrywide.
19   Q.    He said Countrywide?  All
20  right.
21   A.    In Montgomery.  Because one day
22  I went out there.  I was going to stop out
23  there to see -- I know after that, I was

Page 227

1   going to stop out there.  He was waiting so
2   long and hadn't got me no correspondence
3   back.  I was going to stop out there and
4   see what had he sent me.
5    Q.    Did anybody other than that guy
6   tell you that the insurance was going to
7   pay off the loan?
8    A.    Nobody but that guy.  The other
9   guy just told me that it was totalled.
10   Q.    Okay.  Did that guy have any
11  idea how much the loan was?
12   A.    No.  No, he didn't tell me.
13   Q.    Do you have any idea if you
14  even knew?
15   A.    He just told me -- way he
16  talked, we saw -- I had something,
17  insurance -- yes, it did.  It had $23,000
18  for property.  On that insurance.  And he
19  said, "This surpass all this."  That's what
20  the guy said.
21   Q.    Do you know how much the loan
22  balance was at the time?
23   A.    No, I didn't.

Page 228

1    Q.    Do you know if he knew how much
2   the loan balance was?
3    A.    No, I don't.
4    Q.    If he didn't know how much the
5   loan balance was, how could he tell you
6   that it was going to pay off by insurance?
7    A.    Well, I guess I was speculating
8   that the insurance would pay off the full
9   value of the insurance, not just the loan.
10   Q.    You were speculating that the
11  claim was going to exceed the amount of the
12  insurance?
13   A.    Right.
14   Q.    Did he tell you it would?
15   A.    He told me that I should get
16  over twenty something thousand dollars out
17  of it.  I done forgot which house we was
18  at.  And he says, "I ain't worked at them
19  other two houses."  That was that other
20  guy.  But the other guy, I told you what he
21  said.  It was two of them came.
22   Q.    Do you know how much the total
23  debt on the houses was at the time?

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                    http://www.TylerEaton.com

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 233 to 236)

Page 233

1  character witness for that boy. And we
2  talked about that. And then we got back on
3  my case.
4      Q.   All right. But in March -- I'm
5  going to tell you how I understand
6  redemption works very simply, and tell me
7  if it makes sense to you.
8      When you redeem after
9  foreclosure, basically you have to -- you
10 basically have to buy the property back.
11 You have to pay off what the buyer paid to
12 purchase the property. Does that make
13 sense?
14     A.   $6,000.
15     Q.   It was like $6,700, wasn't it?
16     A.   Right.
17     Q.   Their bid. So you knew you'd
18 have to pay that plus interest and some
19 other expenses. Is that something you
20 discussed with your attorney?
21     A.   Well, they had the interest
22 already included when he bid.
23     Q.   Okay. But it was your

Page 234

1  intention to redeem that purchase, right?
2  To buy it back?
3      A.   Right. Through my insurance
4  money.
5      Q.   You were going to use the
6  insurance money to do it. Okay. All
7  right.
8      Other than insurance money, did
9  you have any other money that you were
10 planning to be able to use to redeem the
11 property?
12     A.   Well, I had went and talked
13 to -- to redeem the property? No, because
14 I knew I was going to have plenty. I know
15 what you talking about now.
16     Q.   Okay. You assumed that the
17 insurance would be more than enough to buy
18 it back?
19     A.   Right. Right.
20     Q.   But nobody ever sent you
21 anything in writing showing you that?
22     A.   No, I just know I had so many
23 policies. And one of them had twenty

Page 235

1  something -- each one of them had twenty
2  something thousand dollars per house. And
3  I knew that was more than enough.
4      Q.   Okay. I think you showed me
5  one document before that had an insurance
6  coverage amount on it, but I'm not sure you
7  showed me more than one.
8      Defendant's Exhibit 18. Okay.
9  That's a letter from Countrywide about
10 forced placed insurance. That's something
11 that you and your attorney talked about
12 briefly a little while ago -- but insurance
13 that Countrywide was going to obtain on one
14 of the properties because it didn't have
15 any proof that any other insurance was in
16 place. And it shows a loan balance of
17 $23,000, right?
18     MR. SAWYER: Okay.
19     Q.   (BY MR. WARFIELD:) And it was
20 going to insure that for its loan balance.
21 Okay. Is that what you understood to mean
22 that you would have $23,000 of coverage for
23 each property?

Page 236

1      A.   That's what I understood.
2      Q.   Okay. That one only shows one
3  property. Ice Street.
4      A.   That's what I said. It just
5  showed Ice Street. And I was saying well,
6  I got $23,000 worth of coverage on Ice
7  Street, and I got $23,000 of coverage on
8  110 Hubbard Street, and I got $23,000 worth
9  of property on 410 Hubbard Street.
10     Q.   Okay. You assumed that? Or
11 did you see something that said that?
12     A.   I assumed that.
13     Q.   I told you we'd get to that and
14 I would let you tell me about it. I'm
15 going to mark this group of documents as
16 Exhibit 23. And this is some
17 correspondence between you and Countrywide.
18     A.   Okay.
19     Q.   It's letters from Countrywide
20 to you in March of 2005.
21     A.   Okay.
22     (Whereupon, Defendant's
23     Exhibit 23 was marked for

59

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 237 to 240)

Page 237

1      identification.)
2      A.    Okay.
3      Q.    (BY MR. WARFIELD:)  What I want
4   to do, I showed you a minute ago a letter.
5   Defendant's Exhibit 22 is a letter from
6   your attorney to Ms. Rouse.  That was in
7   March, asking about the insurance issue.
8   And that correspondence seems to deal with
9   the same issues, but I want you to just
10  tell me what you remember happening in
11  March; who you talked to, who said what.
12     A.    I talked to Ms. Sharon U. on
13  the phone, and she told -- and I talked to
14  her about was anything owed on the
15  insurance.
16     Q.    Okay.
17     A.    On the property.  And she told
18  me no, that the insurance company had paid
19  them off.  I said, "Well, you know, would
20  you send me a copy of that?"  And she said,
21  "Yes, I will."  I said, "I got a fax
22  number."  I said, "Will you fax it first?"
23  She said, "I'll fax it first, and then I'll

Page 238

1   send you a copy."
2      Q.    Okay.
3      A.    So she sent me this copy here
4   saying, "Principal paid, $9,287.  Insurance
5   paid, $25."  All right.  And then she sent
6   me...
7            I said, "This spells some of
8   what I want."  I said, "But you said that
9   the insurance has paid."  I said, "Send me
10  a copy showing me how much I owe -- I mean
11  how much insurance has paid off the
12  property, off the note."  That's why I
13  said, "Send me a copy showing me that the
14  insurance has paid off the property."  So
15  she sent me a letter --
16           MR. SAWYER:  I'm looking at it.
17     A.    Okay.  She sent me a letter
18  confirming the amount.  She said, "This
19  letter is to confirm the amount that your
20  insurance company sent to pay off your
21  mortgage.  We received $9,287 on December
22  the 31st, 2004.  We hope we have addressed
23  your concerns satisfactorily.  If you

Page 239

1   require any further assistance, please feel
2   free to contact customer service department
3   directly."
4            MR. SAWYER:  Was that on one
5   piece of property or all of the properties?
6            THE WITNESS:  This right here?
7            MR. SAWYER:  Does it say?
8            THE WITNESS:  It don't say.
9            MR. SAWYER:  Excuse me.
10           THE WITNESS:  Um-hmm.  Then --
11  this is a fax here.
12     Q.    (BY MR. WARFIELD:)  What date
13  was that letter, sir?
14     A.    It was March the 23rd, 2005.
15     Q.    Okay.
16     A.    So then I called again.  I was
17  kind of scared about that.  I called again.
18  I talked to some more folks.  Then the guy
19  I talked to, he said, "Yes, sir, the
20  mortgage has been paid."  It says, "Thank
21  you for your recent correspondence
22  addressed to Countrywide Home Loans.  This
23  letter is to confirm that payoff funds for

Page 240

1   the above-referenced loan account were
2   received on the 12th the 31st of 2004.  We
3   hope we have addressed your concerns
4   satisfactorily.  A friendly suggestion.  If
5   you need further information, please call
6   our customer service department at
7   1-800-669-9906.  Thank you for your
8   business and thank you for the opportunity
9   to be of assistance."
10     Q.    That was on --
11     A.    That was on March the 24th.
12     Q.    Okay.  And who sent that
13  letter.  Can you tell?
14     A.    Let me get his name.  Yeah.  I
15  think it -- it was Shannon.  His name ain't
16  hooked on to it, but I can look -- see this
17  fax -- that loan number there?  I hook it
18  back on to one of them pages, and it will
19  show me --
20     Q.    Okay.  What's that guy's name?
21     A.    That's Shannon U., I believe.
22  Let's see.  Yeah.  That's account No. 418.
23  No, this is different.  This one, request

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 241 to 244)

Page 241

1  date, Shannon Marie Utley.
2      Q.   I assume that's Shannon U.,
3  Shannon Utley?
4      A.   Okay.  3/7/2005.  "Enclosed is
5  the loan...detailed...transactions for the
6  above-referenced account number.  Please
7  note that this history provides pertinent
8  information on payments received, tax and
9  insurance disbursements...and assessed and
10  paid.  Countrywide is committed to provide
11  you with quality loan service."
12      Q.   Okay.  So on March 7, 2005,
13  Ms. Utley, Shannon Utley, sent you a loan
14  history?
15      A.   Right.
16      Q.   Okay.  Now, you realize at that
17  time, the loan had already foreclosed,
18  right?
19      A.   Right.
20      Q.   Okay.  Then on the twenty --
21      A.   No, this ain't a loan history
22  here.
23      Q.   The letter of March 7th says,

Page 242

1  "Please find enclosed a loan history,"
2  right?  I'm just repeating what you read.
3  You can read it again.
4      A.   Yeah, it say a loan history.  A
5  loan history.  That don't mean it ain't not
6  paid off.
7      Q.   Okay.  That sent you a loan
8  history, right?
9      A.   Okay.
10      Q.   And you were aware that the
11  foreclosure had happened long before then,
12  right?
13      A.   Right.
14      Q.   Okay.  That was my only
15  question.
16      A.   Okay.
17      Q.   Then on the 24th -- I'm sorry.
18  On the 23rd, she sent you another letter
19  that talked about the insurance proceeds?
20      A.   This is to inform you that the
21  following credit report adjustment..."  I
22  asked -- this ain't Ms. Sharon.  This
23  another lady.  I asked her, I said, "Would

Page 243

1  you please tell me that -- would you please
2  tell me..." -- no.  "Send me some -- send
3  to credit bureau so I won't be showing that
4  I owe Countrywide a bunch of thousand
5  dollars.  Will you send them some
6  correspondence showing that this loan is
7  paid off?  And send me a copy."  And the
8  lady said, "Oh, I'll be glad to do that."
9  She said, "I'll do that."
10      So she sent, "Important message
11  about your loan.  This is to confirm the
12  following credit report adjustment was
13  submitted to the four main credit bureaus.
14  Show loan foreclosed with zero balance on
15  11/04.  This request for adjustment was
16  submitted on March 24, 2005 to the
17  following reporting agencies:  Equifax
18  Credit Information, Experian, Trans Union
19  Credit, Data Solutions," whoever they was.
20      Q.   Okay.  So March 24th, they sent
21  you a letter confirming they had sent an
22  adjustment to the credit bureau showing
23  your loan as having been foreclosed with a

Page 244

1  zero balance on November '04?
2      A.   Right.
3      Q.   Okay.  All right.
4      A.   Then later on they sent me an
5  overpayment check.
6      Q.   Okay.
7      A.   Showing that everything was
8  taken care of and I had this much money
9  left in escrow, $139 left in escrow, and
10  they sent me the check.
11      Q.   Okay.  And do you have a
12  problem with them having sent you that
13  check?
14      A.   No.  Because I didn't owe them
15  nothing.
16      Q.   Okay.  All right.  I'll put
17  that exhibit back together, if I can.  I'll
18  put them in chronological order if I can.
19      All right.  Ms. Utley sent you
20  a letter telling you that $9,287 had been
21  received in insurance proceeds.
22      A.   Right.
23      Q.   Okay.  You talked about before

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 249 to 252)

Page 249

1  attorney in fact and Roy Brooks, Jr. as
2  their attorney in fact hereto set their
3  hand and seal on the 10th day of November
4  2004." And I wrote on the end "Not My
5  Attorney" because I don't know them.
6          MR. SAWYER: That's just a
7  legal document. Don't worry about that.
8          MR. WARFIELD: Okay.
9          MR. SAWYER: "Attorney in fact"
10 is just the way you have to sign those
11 things.
12         Q.   (BY MR. WARFIELD:) I will
13 suggest to you that my understanding of
14 this document is that only the Small
15 Business Administration mortgage was
16 foreclosed, that the IAM document was not
17 foreclosed. This document refers to the
18 IAM document to say that this deed is
19 subject to the IAM mortgage, which is still
20 outstanding. That's sort of legal jargon.
21 If you don't understand, that's fine. I'm
22 not going to tell you what this document
23 means because it's a legal document and it

Page 250

1  says what it says.
2          A.   Okay.
3          Q.   But I will tell you for
4  whatever it's worth --
5          A.   Did you hear what he just said?
6          MR. SAWYER: I did. I knew
7  that.
8          Q.   (BY MR. WARFIELD:) -- the
9  first mortgage was not foreclosed. Do you
10 understand that there were two loans with
11 Countrywide?
12         A.   That's right.
13         Q.   Okay. We looked at Defendant's
14 Exhibit 10 before.
15         MR. SAWYER: Do you know if
16 anybody's making payments on that first
17 mortgage?
18         THE WITNESS: Ain't nobody
19 making -- oh.
20         MR. WARFIELD: IAM sold it at a
21 pretty deep discount because it hadn't been
22 paid.
23         MR. SAWYER: Yes. I'll talk to

Page 251

1  him about that.
2          Q.   (BY MR. WARFIELD:) This
3  letter, Exhibit 10 -- you may have told me.
4  That fax number, was that your attorney's
5  fax number up here?
6          A.   That's my fax.
7          Q.   That's your fax number?
8          A.   Right.
9          Q.   Okay. So you got this letter?
10         A.   Right.
11         Q.   And this letter is dated
12 March 31st, 2005?
13         A.   Right.
14         Q.   That's about a week after you
15 got a letter from Shannon Utley, right?
16         A.   Right.
17         Q.   This letter says, "Per your
18 request on March 21st, 2005, please note
19 that this loan had checks come in from
20 damage sustained from Hurricane Ivan. The
21 carrier was LPP, forced place coverage,
22 meaning Countrywide is the only named
23 insured, not the borrower. As such, checks

Page 252

1  were made payable to Countrywide only. The
2  funds were processed and property claims as
3  follows:" And it lists two checks,
4  $2,459.85 and then for $735.44.
5          MR. SAWYER: How much?
6          MR. WARFIELD: The first check
7  was $2,459.85. The second check is for
8  $735.44.
9          MR. SAWYER: Got you.
10         Q.   (BY MR. WARFIELD:) I'm not a
11 math whiz, but that's about $3,200. Okay?
12         A.   Say what now? Am I aware --
13         Q.   I'm just telling you that by my
14 math, those two checks would add up to
15 about $3,200. Okay?
16         A.   I was going on what Ms. Sharon
17 told me. Shannon Utley told me they
18 received nine thousand and something
19 dollars.
20         Q.   A week later, Ms. Rouse sent
21 you a letter saying that the amount was
22 different.
23         A.   Then I called back. You know,

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 253 to 256)

Page 253

1  they confirmed it still was the same thing.
2  I even called back after she sent that
3  letter.
4      Q.    Who did you call afterwards?
5      A.    I don't know.  The lady --
6  person on the phone confirmed that the loan
7  was paid off and how much they paid.  Said
8  the insurance paid.  And then she went
9  back.  She said, "Did you receive a letter
10 from..." -- she got the name of one.  I
11 said yeah.  She said, "Well, they sent you
12 documents showing what the insurance paid."
13     Q.    They sent you what documents?
14     A.    The one from Ms. Sharon Utley
15 and all that crap saying that --
16     Q.    And a week later, your attorney
17 sent you a letter giving you specific check
18 amounts.
19     A.    Yeah.
20     Q.    And who did you talk to after
21 that?
22     A.    Somebody up there at
23 Countrywide.

Page 254

1      Q.    Don't remember who?
2      A.    No.  But all they told me, that
3  they looked it up on the computer and say,
4  "We show right here where you have already
5  received documents."
6      Q.    Okay.
7      A.    "So we sent you a letter to the
8  credit bureau.  We sent you a letter here
9  showing that your loan is paid off zero."
10     Q.    So what did you do next?
11     A.    Nothing.  I didn't do nothing.
12         THE COURT REPORTER:  I need to
13 take a break.
14         MR. WARFIELD:  Sure.
15         (Whereupon, a break was had
16         from 6:39 until 6:50.)
17     Q.    (BY MR. WARFIELD:)  After you
18 got the letter from -- you and/or your
19 attorney got this letter from Ms. Rouse at
20 the end of March 2005 --
21         MR. SAWYER:  You mean
22 Mr. Thomas, right?
23         MR. WARFIELD:  Yes.  Right.

Page 255

1  What did I say?
2         MR. SAWYER:  You said attorney.
3         MR. WARFIELD:  Thank you.
4      Q.    (BY MR. WARFIELD:)  -- what
5  happened next?
6      A.    He -- talking about when we got
7  this?  What happened when we got this --
8      Q.    After you got that letter?
9      A.    Nothing.
10     Q.    And it's up to your attorney
11 whether or not you answer this question,
12 but did you and your attorney have a
13 strategy for what you would do next or what
14 needed to be done?
15     A.    Well, he felt like I had been
16 wronged.  That's what he says.
17     Q.    Okay.  And tell me why.
18     A.    Why did he felt like I been
19 wronged?
20     Q.    Right.
21     A.    Well, we had literature from
22 Countrywide showing that they had paid off
23 money.  And, you know, we hadn't -- they

Page 256

1  had paid off -- the insurance had paid off
2  proceeds, and we hadn't got any or got any
3  put toward this -- this big loan that she
4  say we owed.
5      Q.    Let me ask you this.  How much,
6  if anything, would you have been able or
7  willing to pay to redeem the property from
8  foreclosure?
9      A.    Well, see, after I talked to
10 the insurance man and the people, me and
11 him, see, we took, well, two, three hours.
12 We took time and went through that stuff
13 and he wrote this and he talked to me and I
14 talked to him.  And I wasn't willing to pay
15 nothing because I know I had money coming.
16     Q.    Okay.  In the March 31st letter
17 from Ms. Rouse, again, that says only about
18 $3,200 came in from insurance?
19     A.    That's what she said.
20     Q.    And I can't tell you as we sit
21 here today if that's right or not.  If it
22 was, if that's all the insurance company
23 actually paid, were you in a position or

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 261 to 264)

Page 261

1  understand that.
2      Q.   Okay.
3      A.   The part I don't understand is,
4  you know, IAM had sold a mortgage over to
5  Beal Bank.  Beal Bank had sold both of them
6  over there.  When I was writing them --
7  and, you know, we discussed this part going
8  into litigation.  When I talked to them,
9  they told me that they was foreclosing on
10 IAM and the Small Business.  I didn't know
11 they just closed on the Small Business
12 until today.
13     Q.   Who told you that?
14     A.   Pardon me?
15     Q.   Who told you that?
16     A.   They told me that up there at
17 the place.  I didn't know it till today.  I
18 understand now.  I didn't know it until
19 today.
20     Q.   Who was it that told you they
21 foreclosed both?
22     A.   That's what I was told up at
23 Countrywide.  I can't remember which one of

Page 262

1  them.  I talked to so many.  I done talked
2  to a bunch of them.
3      Q.   Okay.  All right.  So was there
4  anything else that happened?  Was it -- did
5  anything else happen between when you and
6  your attorney talked about this and when
7  Mr. Sawyer filed the lawsuit?
8      A.   Was anything else talked?
9      Q.   Yeah.  Did you do anything
10 else?  Did you talk to anybody else at
11 Countrywide?  Were there any other steps?
12     A.   After I got the documents and
13 the insurance waiting on from her and
14 waiting on the insurance to pay and they
15 didn't pay us, I start talking to other
16 attorneys, yeah.
17     Q.   And all I'm trying to ask is
18 did anything else happen before the suit
19 got filed?
20     A.   Ain't nothing happen.
21     Q.   Did you ask your other
22 attorney, Mr. Thomas, to contact the
23 insurance guy that y'all had talked to?

Page 263

1      A.   Mr. Thomas -- I talked to
2  Mr. Thomas about it.  He said, "Well, I
3  know what the man said."  And he said,
4  "Something wrong here."
5      Q.   But did Mr. Thomas to your
6  knowledge ever request any information from
7  the insurance company?
8      A.   Mr. Thomas was waiting on them
9  to send the information after he sent the
10 check over to Countrywide.  He was waiting
11 on them to send the information.  He never
12 sent any.
13     Q.   I understand he was waiting on
14 it.  Did he ever do anything to go try and
15 get it?  Did he call?  Did he send them
16 anything?
17     A.   I think -- I don't know why he
18 didn't go no further.  I think my little
19 money I paid him had burnt out.  I don't
20 know for sure.
21     Q.   I understand.
22     A.   He might have done the maximum
23 of what he was intending to do for what I

Page 264

1  gave him.
2          MR. SAWYER:  I think Mr. Thomas
3  was under the impression -- he can verify
4  this.  I think Mr. Thomas was under the
5  impression that everything was foreclosed
6  at one time.
7          THE WITNESS:  Yeah.
8          MR. WARFIELD:  Okay.
9          THE WITNESS:  He was under that
10 impression.
11         MR. SAWYER:  You need to
12 clarify that with him.
13         MR. WARFIELD:  Okay.
14         MR. SAWYER:  And I'll let this
15 gentleman know, okay?
16     Q.   (BY MR. WARFIELD:)  All right.
17 And I think you've already answered this
18 question but, again, assume with me for
19 just a minute that there wasn't enough
20 insurance to pay off the mortgages.  Were
21 you willing to pay anything to redeem the
22 mortgages in 2005?
23     A.   Yes.

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 277 to 280)

Page 277

1    rooms. And all the ceiling, wood and all
2    just come down. It was gone.
3        Q.   Do you have any estimate how
4    much it would cost to repair that house?
5        A.   Yeah. That's the one I told
6    you totally gone is $30,000.
7        Q.   It was worth $30,000?
8        A.   That's what I say it's worth.
9        Q.   And I'm asking about repair
10   costs. If you know. If there could have
11   been any.
12       A.   To me --
13       Q.   Not reparable too much?
14       A.   Right.
15       Q.   More than the $30,000 you
16   thought it was worth?
17       A.   Right.
18       Q.   I asked you this before, but do
19   you have any pictures of those houses
20   before Hurricane Ivan?
21       A.   I've got some. I'm going to
22   try to get some up. I know I can't remember
23   410 Hubbard Street. And I can't remember

Page 278

1    what I got of some of the other houses.
2        Q.   Would these be pictures before
3    or after the hurricane?
4        A.   Before the hurricane.
5        Q.   Do you have any from after the
6    hurricane?
7        A.   No.
8        Q.   Can you think of anybody who
9    would be able to tell me now what those
10   houses looked like after the hurricane?
11   Any other witnesses?
12       A.   No.
13       Q.   Are there any other neighbors
14   around that you could think of that I could
15   talk to to ask those questions?
16       A.   Because the guy, the guy across
17   from the house, he died. And the lady that
18   lived below in the other house, they left.
19   I don't know where they moved. Her and her
20   husband separated. They went their
21   separate ways.
22       MR. SAWYER: If you can think
23   of anybody.

Page 279

1        THE WITNESS: I can't think of
2    any.
3        MR. SAWYER: If you can think
4    of anybody, let me know next week, and I'll
5    let this gentleman know.
6        THE WITNESS: I will.
7        MR. SAWYER: Try.
8        THE WITNESS: All right. I'll
9    be trying.
10       MR. SAWYER: I apologize for
11   continuing to interrupt your deposition,
12   but I want to try to give him some
13   guidance.
14       THE WITNESS: I appreciate it.
15       Q.   (BY MR. WARFIELD:) This is
16   going to sound like potentially a
17   repetitive question, but I'm going to ask
18   this in a little bit different way. Tell
19   me as directly as you can in your own words
20   what it is that Countrywide did wrong that
21   you're suing them for.
22       A.   Well, I'm suing about the
23   insurance money. And now I feel like I got

Page 280

1    other things to sue them for because they
2    put the IAM, all about that loan in the
3    paper, and they wasn't foreclosing on that
4    loan. So, you know, that's extra. And I
5    could have saved my property, and I'd have
6    had all that property if they had paid the
7    insurance like they -- like I was told,
8    from the information I was told. I could
9    have had them three houses standing over
10   there now.
11       I got some children right now
12   need a house. I got two boys here right
13   now need a house. And them houses over,
14   see, they could move in there. They had to
15   come back from up north, and they ain't got
16   nowhere to stay.
17       Q.   Okay, I'll ask you some
18   follow-up questions on those.
19       The first thing you said was
20   about the insurance money. What do you
21   think Countrywide did wrong with respect to
22   the insurance?
23       A.   Well, when they got the money

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 289 to 292)

Page 289

1    A.    They sent me a policy.
2    Q.    Who did?
3    A.    Countrywide.
4    Q.    Before they sent you a lender
5  placed policy, did you have any coverage on
6  those properties?
7    A.    Talking about before then?  I
8  have had it, but I didn't have it at that
9  time until I got a replacement.
10    Q.    You let it lapse.
11    A.    Possibility.
12    Q.    Okay.  Who was it with?
13    A.    I can't remember.
14    Q.    You don't have any idea?
15    A.    I just really can't remember.
16  I know one time it was with -- I've had
17  more than one person.  And one time it was
18  with National Security.  I just can't
19  remember who --
20    Q.    And sometime before Hurricane
21  Ivan came, you let that insurance lapse?
22    A.    Yeah.
23    Q.    Okay.  Countrywide told you

Page 290

1  that it was putting insurance on the
2  property?
3    A.    I got insurance after -- that's
4  right.  That's right.  Countrywide say
5  they --
6    Q.    Is that right?
7    A.    Yeah.
8    Q.    Do you understand that when
9  Countrywide puts insurance on the property,
10  it only insures it to the amount of its
11  loan?
12    A.    I didn't understand that.
13    Q.    Okay.  And so under
14  Countrywide's insurance policy, they never
15  would have paid more than it would have
16  taken to pay off its loan.
17    A.    I didn't understand that.
18    Q.    Okay.  And if they had paid
19  that and you kept your property, you would
20  have had those two broken-down houses that
21  got damaged in the storm?
22    A.    If they had paid what?
23    Q.    If they would have paid off

Page 291

1  their loan, in the best case scenario under
2  their policy, they would have paid off
3  their own loan balance.  There wouldn't
4  have been any insurance money to fix those
5  houses.  Do you understand that?
6    A.    I think so.  Out of three $900.
7  Three nine thousand.  And I had thirty
8  something thousand.  They take $9,000 out
9  and pay off the loan.  So I'd have had
10  around $20,000 there.
11    Q.    But we've already discussed the
12  loan amount was about $38,000, wasn't it?
13  $43,000?
14    A.    That's what she said.
15    Q.    You borrowed $38,000.
16    A.    Could I ask him a question?
17    Q.    Sure.
18    THE WITNESS:  This lady is
19  saying one thing.  Do I have to --
20    MR. SAWYER:  Just try to answer
21  his question.  If you didn't understand
22  that, tell him you didn't understand it
23  like that.  That's all you got to say.  I

Page 292

1  understand what you thought.  I understand
2  what he's saying.  All right?
3    A.    Question?
4    Q.    (BY MR. WARFIELD:)  All right.
5  The only other thing that you mentioned
6  when I asked you what they had done wrong
7  was something about putting the IAM loan in
8  the newspaper?
9    A.    That's right.
10    Q.    Tell me what you mean by that.
11    A.    Well, you stated that the only
12  thing they was foreclosing on was Small
13  Business loan.
14    Q.    Okay.
15    A.    Well, if they was foreclosing
16  on just Small Business, they had no
17  business bothering IAM.
18    Q.    Okay.  All right.  Can you
19  think of anything else you think they did
20  wrong?
21    A.    Well, when, you know, she --
22  she told us she was going to work with us,
23  and she went and foreclosed, sent the guy

ROY BROOKS, JR.
COUNTRYWIDE HOME LOANS, INC., ET AL.

ROY BROOKS, JR.
September 15, 2006

(Pages 297 to 300)

Page 297

1  to make me say it ain't.
2      Q.   Mr. Brooks, I'm asking you.
3  You just told me that Countrywide
4  advertising your property for foreclosure
5  somehow caused you to have to get out of a
6  political race.
7      A.   That's right.
8      Q.   Okay.  But you didn't pay your
9  mortgage, did you?
10      A.   Well, I --
11      Q.   Did you pay your mortgage?
12      A.   It was extenuating
13  circumstances.  And when the storm hit, I
14  had something to pay it with, pay it all
15  off if they would have gave me a chance.
16      Q.   How long had it been before the
17  storm hit that you had paid your mortgage?
18      A.   I can't remember.
19      Q.   Okay.  And the foreclosure
20  notice was published before the storm hit,
21  wasn't it?
22      A.   It was.  But it got taken care
23  of.  I satisfied what they wanted.

Page 298

1      Q.   The publication of the
2  foreclosure notice happened before the
3  storm hit, didn't it?
4      A.   They always send it out right
5  before --
6      Q.   Okay.
7      A.   They didn't send it out before
8  the storm, no.  No.  No.
9      Q.   The foreclosure was
10  scheduled --
11      A.   No.
12      Q.   -- in August of 2004.
13      A.   That's something else that was
14  taken care of.  No.  That got taken care
15  of.  This last foreclosure -- they didn't
16  foreclose on me then, you know.
17      Q.   They published notice before
18  the storm.  You're aware of that, aren't
19  you?
20      A.   They published notice, and it
21  got taken care of.
22      Q.   It's your testimony, though,
23  that the public notice is what caused you

Page 299

1  some harm in your political race?
2      A.   Some of it.
3      Q.   And that happened before the
4  storm, right?
5      A.   Nope.  It happened -- the one
6  that got me -- because I hadn't even
7  qualified before the storm.  I meant
8  before -- back when you saying in August.
9  I hadn't even qualified then.
10      Q.   When did you qualify for the
11  race?
12      A.   I qualified before the
13  deadline.  It was the last of October.
14      Q.   Okay.  The end of October?
15      A.   Um-hmm.
16      Q.   Okay.  What did Countrywide do
17  after the end of October that caused you to
18  draw out of the race?
19      A.   Well, we had got together on
20  what we was going to do, and they didn't
21  keep up their side of the bargain.  So I
22  think --
23      Q.   What does that have to do with

Page 300

1  your political race?
2      A.   Well, sir, this is just my
3  opinion.  I thought I could have my
4  opinion.
5      Q.   Well, you're welcome to it.
6  But you're suing my client, and you're
7  claiming that the --
8      A.   I'm your client?
9      Q.   I'm sorry?
10      A.   I'm your client?
11      Q.   No, you're suing my client.
12      A.   Oh, okay.
13      Q.   And you just said that they
14  somehow caused you to have to pull out of a
15  race that you didn't qualify for until a
16  week before the foreclosure.
17      A.   Yes, sir.  And that's my
18  opinion.
19      Q.   And what did they do after you
20  qualified for the race that caused you to
21  withdraw?
22      A.   I said when they published my
23  name in the paper.  They also added a loan

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                        http://www.TylerEaton.com