**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

**ROY BROOKS, JR.,**

     **Plaintiff,**

**v.**

**COUNTRYWIDE HOME LOANS, INC.**
**ET AL.,**

     **Defendants.**

            **CIVIL ACTION NO.**
            **2:06CV356-MHT**

**DEFENDANT COUNTRYWIDE HOME LOANS, INC.'S, REPLY**
**TO PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Comes now, Defendant Countrywide Home Loans, Inc. ("Countrywide"), and, for its reply to the Response in Opposition to Defendant's Motion for Summary Judgment ("Plaintiffs' Opposition"), says unto the Court the following:

**I. INTRODUCTION**

Plaintiff's Opposition fails to establish any genuine dispute as to any material fact, and Countrywide is entitled to judgment as a matter of law. Nothing in the plaintiff's Opposition refutes the undisputed evidence offered by Countrywide that: (1) the plaintiff defaulted on the repayment of his two mortgages; (2) Countrywide properly and rightfully foreclosed the Second Mortgage in November 2004; (3) the plaintiff never made any effort to redeem the collateral properties from foreclosure; and (4) there were not (and could never have been) sufficient insurance proceeds generated from Countrywide's lender placed hazard insurance policies to pay the plaintiff's two mortgages in full. Because these facts remain undisputed, Countrywide is entitled to summary judgment.

The facts and arguments raised in the plaintiff's Opposition are immaterial to the dispositive legal issues before the Court. They are also unsupported by substantial evidence as required by Rule 56, *Fed. R. Civ. P.* Moreover, they demonstrate the plaintiff's continued unwillingness to accept any responsibility for his own prolonged failure to perform his contractual obligations under the two mortgages. In short, Mr. Brooks has no one but himself to blame for the loss of his properties through foreclosure, as he himself failed to pay his mortgages, to insure the properties, or to make any effort to redeem the properties from foreclosure. Certainly, the plaintiff has failed to establish <u>by substantial evidence</u> that Countrywide is liable to him for any breach of contract, negligence or fraud. Countrywide's Motion for Summary Judgment is, therefore, due to be granted.

## II.   ARGUMENT

### A.   Brooks Could Not Reasonably Have Been Misled As To The Amount Needed To Redeem The Properties From Foreclosure.

The plaintiff claims that he was "confused" or misled by Countrywide after the November 2004 foreclosure into believing that his mortgages (apparently, <u>both</u> of the mortgages, with their combined unpaid balances of over $40,000) had been paid <u>in full</u> using insurance claim proceeds received by Countrywide after foreclosure as a result of storm damage caused by Hurricane Ivan. (Opposition, p. 5.) However, the undisputed evidence establishes that Countrywide <u>accurately informed</u> the plaintiff of the total amount of insurance proceeds that it had received and of the specific amount that the plaintiff would need to pay in order to redeem the properties pursuant to his one-year statutory right of redemption. If and to the extent that the plaintiff believed that both of his mortgages had been paid in full, that belief was wholly unreasonable as a matter of law.

The Second Mortgage was foreclosed by Countywide on November 10, 2004. (Countrywide's Initial Brief, p. 7 (¶11).)  In the months that followed, the plaintiff and his attorney inquired about Countrywide's receipt of insurance claim proceeds resulting from claims for storm damage caused by Hurricane Ivan.  Plaintiff and his attorney also specifically requested to be told the amount that the plaintiff needed to pay to redeem the properties from foreclosure. (Countrywide's Initial Brief, pp. 9-10.)  On March 23, 2005, in response to a specific written request from the plaintiff's attorney, Countrywide's outside foreclosure counsel, Beth Rouse, sent the plaintiff and his attorney a detailed letter itemizing the amounts of the two insurance claim checks that were received by Countrywide in January 2005.  Rouse's letter also provided itemized redemption amounts for both mortgages as of that date. (Countrywide's Initial Brief, p. 10.[1])  The total amount of the two insurance claim checks was $3,195.29.  The total amount owed on the Second Mortgage alone was $14,132.32, and the total amount needed to pay both mortgages and redeem the properties was $43,970.38. (*Id.*)

In support of his contention that he was misled by Countrywide, plaintiff refers only to a March 23, 2005, letter from a Countrywide employee indicating that one of the plaintiff's two mortgages (the Second Mortgage, which had a much lower unpaid principal balance ($9,287.00) than the First Mortgage ($23,324.50)) had been paid in full using insurance claim proceeds received by Countrywide on December 31, 2004. (Opposition, p. 5 & exh. A.)  As Countrywide has admitted and explained in its initial summary judgment brief, this March 23rd letter was unfortunately erroneous, as Countrywide had not actually received insurance claim proceeds sufficient to pay off either loan.  Rather, the December 31, 2004, entry referenced in the March

---

[1] *See* Countrywide's Evidentiary Submission, Exh. 4 (Affidavit of Beth Rouse) at exh. 10; Exh. 10 (Brooks Deposition) at pp. 169, 250-254 and exh. 10).

23rd letter was simply an internal Countrywide accounting entry to "zero out" the Second Mortgage account as a bookkeeping matter following the foreclosure of that mortgage.[2]

The March 23rd letter, however, could not <u>reasonably</u> have led the plaintiff to believe that <u>both</u> of his loans had been paid <u>in full</u>. First, the First Mortgage, which had a total debt balance of over $29,000 and on which Brooks had made <u>no payments in over a year</u>, was not even mentioned in that letter. More importantly, however, the March 23rd letter was followed <u>one week later</u> by Beth Rouse's detailed letter to the plaintiff and his attorney of March 31, 2005, which, as a matter of law, would have removed any <u>reasonable</u> belief that either mortgage had been paid in full. *See Redman v. Federal Home Loan Mortgage Corp.*, 765 So. 2d 630 (Ala. 2000) (parties "on notice of everything to which a reasonable inquiry would have led"); *see also Reynolds v. Birnbaum*, 534 So. 2d 1052 (Ala. 1988) (allegedly fraudulent statements regarding foreclosure were not relied upon by or injurious to plaintiff); *Pace v. Colonial Penn Ins. Co.*, 690 So. 2d 369, 372 (Ala. Civ. App. 1996) (mortgagees represented by counsel could not justifiably relied upon on alleged misrepresentations of insurer as to payment of insurance proceeds after foreclosure).

In March 2005, Countrywide, through Rouse, thus provided the plaintiff with complete and accurate information regarding both the insurance claim proceeds received and the current balances owed on the two mortgages. At that time, the plaintiff still had more than <u>seven months</u> to redeem. *Ala. Code* § 6-5-248 (1975). However, <u>Brooks never made any attempt to redeem his properties from foreclosure</u>. Nor did Brooks inquire further of Countrywide, the insurance company or the independent adjuster about the amount of the claim proceeds that were paid to Countrywide under the insurance policies.

---

[2] *See* Countrywide's Summary Judgment Brief, pp. 9-10, n. 5; Countrywide's Evidentiary Submission, Exh. 5 (Declaration of Emily Cedillo Galindo) at ¶ 14.

Plaintiff has thus failed to offer substantial evidence that he was actually misled by, or reasonably relied to his detriment upon, the March 23rd letter from Countrywide or any other allegedly confusing statements by Countrywide which the plaintiff claims suggested to him that his mortgages had been paid in full. Because plaintiff did not reasonably or detrimentally rely upon any alleged misrepresentations by Countrywide, and because Countrywide did not cause ay injury to the plaintiff, Countrywide is entitled to summary judgment on the negligence and fraud claims.

**B.    Plaintiff Has No Basis To Complain That The Windfall He Received From Countrywide's Lender Placed Insurance Should Have Been Larger.**

Plaintiff also complains that he was "tasked single-handedly by Countrywide to deal with the insurance companies" and that Countrywide somehow "set him up to fail" in his attempts to obtain insurance coverage for the storm damage to the properties. This could not be further from the truth, as is established by the undisputed evidence in the record. In any event, the plaintiff's allegations are simply immaterial to the dispositive legal issues before this Court. These complaints do, however, demonstrate the plaintiff's complete refusal to take any responsibility for his own failure to perform his obligations under the mortgage contracts.

Both of the plaintiff's two mortgages required the plaintiff to maintain hazard insurance covering the collateral properties. (*See* Countrywide's Initial Brief, pp. 17-18; Second Mortgage, ¶ 1.(f), 6; First Mortgage, p.1.) Countrywide, as the mortgagee, had no such obligation. Rather, Countrywide had the contractual right and option to procure insurance to protect its interest in the properties if the plaintiff breached the contract by failing to obtain his own insurance. *Id.* Certainly, nothing in the mortgage contracts required Countrywide to attempt to ensure that the plaintiff took any and all necessary steps to protect his own interests by pursuing or maximizing

claims under the very insurance policies that Countrywide was forced to obtain <u>at its own cost</u> <u>and for its own benefit</u> because of the <u>plaintiff's</u> failure to obtain his own insurance.

While Countrywide had no obligation to do so, it obtained lender placed insurance to protect its interest in the properties when the plaintiff failed to obtain it himself. <u>Plaintiff never</u> <u>paid a dime for the lender placed insurance coverage Countrywide obtained.</u>[3] Luckily, Countrywide obtained lender placed coverage shortly before Hurricane Ivan struck Alabama in September 2004. Because Countrywide acted to protect its own interest (and at its own cost), the plaintiff received the entirely <u>free</u> benefit and windfall of having some insurance in place to cover damage caused by Hurricane Ivan. That gratuitous benefit allowed the plaintiff to have the substantial deficiencies owed on his two defaulted mortgages decreased by $3,195.29, when claim payments in that amount were paid to Countrywide by the lender placed insurance carrier in January 2005 (*See Countrtywide's Initial Brief*, p. 9.)

Despite having made no effort to obtain his own insurance and despite having paid nothing for the insurance put in place by Countrywide, plaintiff now suggests that <u>Countrywide</u> should somehow have obtained (or prompted plaintiff to obtain) enough insurance claim proceeds to pay <u>both</u> of his mortgages in full. While Countrywide had no duty or obligation to do this for the plaintiff, the lender placed insurance obtained by Countrywide <u>could never</u> have paid the plaintiff's mortgages in full anyway. (*See* Countrywide's Initial Brief, p. 15.) Rather, the lender placed policies provided coverage only up to the <u>unpaid principal balance</u> of the

---

[3] While Countrywide had the contractual right to charge plaintiff for the cost of the insurance, plaintiff never made <u>any payments</u> of any kind to Countrywide on either mortgage and did not pay any of the premiums for the lender placed policies. (*See* Countrywide's Initial Brief, pp. 7, 18.) In fact, as established by the plaintiffs' Opposition, plaintiff actually received a <u>refund</u> from his escrow account for an "escrow overage," or the unpaid premium paid on the insurance policy remaining after foreclosure. Countrywide has not sought to recover the refund check or reimbursement from Brooks.

plaintiff's two mortgage loans. Because the loans had both been in default for long periods prior to foreclosure, each loan had an outstanding balance (including accrued interest, foreclosure and other fees, and other charges) well in excess of the unpaid principal balance (and, accordingly, the policies' coverage limits). (Cedillo-Galindo Dec., exh. 5; Rouse Aff., exh. 9.) Thus, even if the insurer determined that the properties suffered sufficient storm damage for the insurer to pay its <u>full policy limits</u> under the lender placed policies, the maximum insurance coverage available would still have been insufficient to pay the amounts owed on the plaintiff's two mortgages.

Finally, the plaintiff cannot blame Countywide for his own failure to obtain or pursue claims payments on the third property (410 Hubbard Street), which the plaintiff claims also suffered damage in Hurricane Ivan. The independent adjuster testified that Brooks never showed that property to him or informed him of any damage to it. (Countrywide's Evidentiary Submission, Exh. 7 (Declaration of Ken Cole).) If, as plaintiff claims, the plaintiff was informed by the independent adjuster that the 410 Hubbard Street property was a "total loss" or that the claim proceeds would exceed the amount ($3,195.29) later received by Countrywide, then the <u>plaintiff</u> should have followed up with the independent adjuster or the insurance company to inquire about the apparent discrepancy in the claim payment. Plaintiff made no attempt to do so, and he cannot blame Countrywide for that failure.

As demonstrated in Countrywide's initial brief, the plaintiff has failed to offer substantial evidence that Countrywide breached any duty or injured the plaintiff with respect to the procurement of hazard insurance or the application of insurance claim proceeds to the plaintiff's mortgage loans.

### C.    The Foreclosure Sale Was Valid and Properly Conducted.

The plaintiff's Opposition also "questions the validity of the foreclosure on his second mortgage as being proper." (Opposition, p. 6.) Notably, the plaintiff does <u>not</u> dispute that he

breached the mortgage contracts by failing to make any payments for many months (if not years) or that Countrywide was contractually entitled to foreclose either or both of the two mortgages. Rather, the plaintiff claims only that Countrywide had agreed to postpone the sale (again) beyond the November 10, 2004, sale date and that the auctioneer did not actually conduct the auction on November 10, 2004. These contentions are not supported by any actual evidence. Moreover, because plaintiff did not suffer any injury as a result of these alleged problems with the foreclosure sale, he cannot state any viable claim against Countrywide.[4]

First, these allegations are immaterial because the plaintiff has not established--and cannot establish--any injury resulting from Countrywide's alleged failure to properly conduct the foreclosure sale. *See First National Bank of Opp v. Wise*, 3 So. 2d 68, 71 (Ala. 1941) (party suing for alleged wrongful or improperly executed foreclosure sale must demonstrate injury resulting from alleged defects); *Garris v. Federal Land Bank of Jackson*, 584 So. 2d 791, 794 (injury by sale necessary to action to void foreclosure sale). The plaintiff has testified that he had no ability or intention to purchase the properties at the foreclosure sale in November 2004. (Brooks Dep., pp. 234, 252-256, 262-263.) Moreover, even if the plaintiff had been able to bid on and purchase the properties at the foreclosure of the Second Mortgage on November 10, 2004, Countrywide would simply have been able to foreclose the First Mortgage, which had a considerably larger unpaid balance ($29,207.33) at the time and which also had not been paid in many months. (Rouse Aff., ¶¶ 3, 9.)

---

[4] There is no allegation in the Complaint in this action that the foreclosure sale was improper or invalid, and the plaintiff has not sought any declaratory or equitable relief of any kind. (Complaint.) The plaintiff in this action has never sought to set aside the foreclosure sale, never filed an action seeking to redeem the properties, and never sought an accounting of amounts owed under the mortgages. Instead, more than a year after the foreclosure sale occurred, plaintiff sued Countrywide only for damages for breach of contract, fraud and/or negligence. (Complaint.)

Plaintiff made it clear that the only means or hope he had of redeeming the properties or of saving them from foreclosure was that the insurance proceeds from Hurricane Ivan-related storm damage would pay the loans in full. (*See* Countrywide's Initial Brief, p. 10 (¶ 20); Brooks Dep., pp. 234, 254-256, 262-263.) As stated above, this could never have occurred. When the plaintiff later discovered that his remaining unpaid balance on the two mortgages, even after the application of the insurance claim proceeds, was in excess of $40,000, the plaintiff simply dropped the issue and took no further action to redeem. *Id.* Because the plaintiff could not have purchased the properties at the foreclosure sale, the alleged deficiencies or defects in the foreclosure sale being alleged by the plaintiff are immaterial and did not cause any injury to the plaintiff.

Second, the plaintiff's allegations challenging the validity of the foreclosure sale are not supported by substantial evidence. For instance, the plaintiff claims that his "then-attorney James Thomas" . . . "had secured a continuance of the November 10, 2004" foreclosure sale date. (Opposition, p. 6.) The Opposition, however, refers to no actual evidence supporting this allegation. In fact, the plaintiff specifically testified at deposition that his attorney was not able to secure a postponement of the foreclosure sale beyond November 10, 2004. According to Brooks own testimony, his attorney called Countrywide's foreclosure counsel (Beth Rouse) on November 10th to request another postponement, but was told by Rouse's office that they could not agree to stop the foreclosure because the auctioneer had already left to conduct the sale. (Brooks Dep., pp. 217-221.)[5]

---

[5] Notably, the plaintiff has not offered any evidence or testimony from his then-attorney, James Thomas, regarding these communications and the plaintiff has admitted that he himself has no firsthand knowledge of Thomas' alleged communications with Rouse on November 10th. *See Fed. R. Civ. P.* 56(e) ("Supporting and opposing affidavits shall be made on personal

9

Beth Rouse's affidavit testimony, which is consistent with Brooks' hearsay description of Thomas' conversations with Rouse on November 10th, confirms that no postponement beyond November 10th was ever agreed to:

> "9.    By letter to me dated October 4, 2004, Brooks' attorney, James N. Thomas, requested that Countrywide postpone the foreclosure sale again because some of the properties had been damaged by Hurricane Ivan in September 2004.    I informed Countrywide of Mr. Thomas' request, and Countrywide agreed to postpone the sale until October 20, 2004.    The sale was then postponed again, to November 10, 2004.    True and correct copies of my e-mail correspondence with Mr. Thomas confirming the postponement **until November 10, 2004**, are attached [to Rouse's Affidavit] as Exhibit 5.
>
> 10.    I was instructed by Countrywide to proceed with the foreclosure on November 10, 2004.    My firm retained Brandon Coots of the law firm of Jones & Coots, L.L.C., in Luverne, Alabama, to perform the public foreclosure sale in Pike County, Alabama on that date.    At approximately 1:44 pm on November 10, 2004, I received a fax from Mr. Coots advising me that the sale had been conducted at 11:30 am on November 10, 2004, and that the properties had been purchased at the sale by the mortgagee for $6,750.00.    A true and correct copy of Mr. Coots' letter is attached [to Rouse's Affidavit] as Exhibit 6.
>
> 11.    **Later on the afternoon of November 10, 2004, my office was contacted by Mr. Thomas,** who informed my office that he was "under the impression" that the foreclosure sale would be delayed until insurance claim proceeds were received by Countrywide and who requested that the sale be postponed until later on the afternoon of November 10th.    Rachel Price, an employee of my office, took the call, and her contemporaneously generated business record of the call is attached [to Rouse's Affidavit] as Exhibit 7.
>
> 12.    **The foreclosure sale had already occurred before Mr. Thomas called my office on November 10th (***see*** paragraph 10 above).    I had not made any agreement on behalf of Countrywide to postpone the foreclosure sale beyond November 10, 2004, and I have no knowledge of anyone else making such an agreement on behalf of Countrywide.  I never**

---

knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.")

> **informed Mr. Brooks or his attorney (James Thomas) that the foreclosure sale would be postponed beyond November 10, 2004."**

(Affidavit of Beth McFadden Rouse (Exhibit 4 to Countywide's Evidentiary Submission), ¶¶ 9-12 (emphasis added).)  Ms. Rouse's sworn affidavit testimony and business records is not disputed or contradicted by Mr. Brooks' own hearsay description of Thomas' communications with Rouse, or by any admissible evidence offered by the plaintiff.

Similarly, the plaintiff has failed to provide substantial evidence to support his allegation that the foreclosure auction was not actually conducted by the auctioneer on November 10, 2004. (*See* Exhibits 6 and 3 to Countywide's Evidentiary Submission).  The only evidence that the plaintiff offers in support of this allegation is his own self-serving, unsupported and uncorroborated testimony that he was at the Pike County courthouse "all day" on November 10th and did not witness the sale.  While even that testimony (if true) would not establish that the sale did not occur (only that plaintiff himself did not see it), the claim is actually refuted by Brooks' own inconsistent testimony and the other undisputed evidence in the record.  First, plaintiff has admitted that he was not at the courthouse "all day."  Plaintiff testified that, before he went to the courthouse on November 10th, he first went to his attorney's office, he then "went off . . to drop my little girl off somewhere," and he then came back to his attorney's office.  At that point, not before, his attorney told him that he had contacted Rouse's office and been informed that the auctioneer was on his way to conduct the sale.  (Brooks Dep., p. 218).  In fact, by the time Thomas' office contacted Rouse's office on November 10th, the sale had already occurred. (Rouse Dep., ¶ 12, Coots Dep., 4.)[6]  That Brooks did not witness the foreclosure sale after going

---

[6]  Plaintiffs' Opposition "asserts [that plaintiff] has a witness (a guard) that will substantiate his contention" that the sale did not occur.  However, the alleged witness has not been identified in the Opposition, discovery in this action or otherwise, and the alleged witness has offered no evidence for the court to consider in ruling on Countrywide's motion for summary judgment.

to the courthouse later that day in no way refutes the sworn testimony and other corroborating documents establishing that the sale occurred at 11:30 that morning.

In sum, the plaintiff has failed to provide evidence creating any genuine dispute of fact as to the conduct of the foreclosure sale, and the plaintiff has also failed to establish any alleged injury suffered as a result of any alleged defects in the sale. Accordingly, the plaintiff's unsupported allegations do not prevent the entry of summary judgment in favor of Countrywide as to all claims.

## III.  CONCLUSION

The plaintiff remarkably concludes his Opposition by claiming: "It is [Countrywide's] very record-keeping that caused Brooks to find himself in foreclosure." This absurd suggestion aptly sums up the plaintiff's claims in this action and his arguments in opposition to summary judgment. In reality, the plaintiff's mortgage was foreclosed because the plaintiff failed to pay his mortgage debt. The plaintiff ultimately lost title to the collateral properties because he did not pay his mortgage, because he did not insure the properties as required under the mortgages, and because he was unable (or did not attempt) to redeem the properties from foreclosure within the time allowed by statute. Because plaintiff has no basis in fact or law to recover from Countrywide, all of his claims are due to be dismissed as a matter of law.

---

Tellingly, in their post-foreclosure communications with Countrywide, neither the plaintiff nor his attorney ever challenged the validity of the sale or suggested that the foreclosure sale had not actually occurred on November 10, 2004. (*See* Thomas letter of March 21, 2005 (Exhibit E to Plaintiff's Opposition).)

Respectfully submitted,


*/s/ Alan M. Warfield*
Alan M. Warfield
(ASB #9183-R68A)

Attorney for Defendant
Countrywide Home Loans, Inc.


OF COUNSEL:

WALSTON, WELLS & BIRCHALL, LLP
1819 5th Avenue North, Suite 1100
Birmingham, AL 35203
Telephone:    (205) 244-5200
Telecopier:    (205) 244-5400

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

J.E. Sawyer, Jr., Esq.
203 S. Edwards Street
Enterprise, AL 36330

Dated the 19TH day of April, 2007.


*/s/ Alan M. Warfield*
OF COUNSEL